2014 WI 127

# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP1638-FT |
| COMPLETE TITLE: | In the matter of the mental commitment of Michael H.: <br><br> Outagamie County, <br>        Petitioner-Respondent, <br>    v. <br> Michael H., <br>        Respondent-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 352 Wis. 2d 248, 841 N.W.2d 582)
(Ct. App. 2013 – Unpublished)

| | |
|---|---|
| OPINION FILED: | December 16, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 7, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Outagamie |
|   JUDGE: | Dee R. Dyer |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs by *Suzanne L. Hagopian*, assistant state public defender, and oral argument by *Suzanne L. Hagopian*.

For the petitioner-respondent, there was a brief by *Patrick M. Taylor*, assistant Outagamie County corporation counsel, and oral argument by *Patrick M. Taylor*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP1638-FT
(L.C. No. 2012ME87A)

STATE OF WISCONSIN      :      IN SUPREME COURT

**In the matter of the mental commitment of Michael H.:**

**Outagamie County,**

      **Petitioner-Respondent,**

  **v.**

**Michael H.,**

      **Respondent-Appellant-Petitioner.**

**FILED**

**DEC 16, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 N. PATRICK CROOKS, J. Outagamie County filed a petition for the involuntary commitment of Michael H., and based on the jury's determination that he was dangerous to himself, the Outagamie County Circuit Court ordered him committed for treatment pursuant to Wisconsin's involuntary commitment statute, Wis. Stat. § 51.20. The heart of the case is the dispute over the evidence that he was dangerous. Michael challenges the sufficiency of the evidence, and we must determine whether the evidence was sufficient to support the jury's conclusion that he was dangerous within the meaning of

Wis. Stat. § 51.20(1)(a)2.a. or 2.c. or both——that there was a substantial probability of injury to himself, based either on threats of suicide or impaired judgment.[1] Because we cannot evaluate the sufficiency of the evidence without examining the meaning of the statute's words, we also must decide what satisfies the statute's requirement of "evidence of recent threats . . . of suicide"——specifically, whether the acts in this case can constitute a threat. Jurors are asked in these difficult cases to determine whether clear and convincing evidence[2] supports a finding of dangerousness, knowing they should neither wrongly deprive a person of liberty nor fail to authorize intervention before a dangerous person harms himself.

¶2 Wisconsin Stat. § 51.20 (2011-12)[3], which establishes the prerequisites for involuntary commitment for treatment, requires a determination that a person is dangerous and provides five grounds for making such a determination. The statute spells out what may serve as grounds for such a determination. In this case, the two grounds alleged relate to Michael's

---

[1] Michael does not dispute Outagamie County's allegation that he is mentally ill and a proper subject for treatment under Wis. Stat. § 51.20(1)(a)1.

[2] State v. Randall, 192 Wis. 2d 800, 818, 532 N.W.2d 94 (1995) (stating, "In civil commitment proceedings, the state is required to prove by clear and convincing evidence that a proposed committee is mentally disabled and dangerous. This is often referred to as the Addington burden, named for the decision that first stated the principle.") See ¶26, infra.

[3] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

dangerousness to himself. Wisconsin Stat. §§ 51.20(1)(a)2.a., (1)(a)2.c. The County did not allege that Michael qualified for commitment on the basis of his dangerousness to others. What the County must prove by clear and convincing evidence in this case is that there was a substantial probability that Michael was dangerous to himself. This can be demonstrated by either "recent threats . . . of suicide or serious bodily harm";[4] "impaired judgment, evidenced by a pattern of recent acts or omissions";[5] or both.

¶3 As to the first basis alleged for finding dangerousness, relating to "recent threats of . . . suicide," Michael contends that the sole evidence is the fact that he answered "yes" to a nurse who asked if he was suicidal. He

---

[4] Wisconsin Stat. §51.20 (1)(a)2.a. states, "The individual is dangerous because he or she . . . [e]vidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm."

[5] Wisconsin Stat. § 51.20(1)(a)2.c. states:

The individual is dangerous because he or she . . . [e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself. The probability of physical impairment or injury is not substantial under this subd. 2. c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, if the individual may be provided protective placement or protective services under ch. 55 . . . .

3

asserts that this is evidence only of thoughts, and that such thoughts do not constitute clear and convincing evidence of threats because the word "threat"[6] has a common meaning of an expression of an intention to act, and he expressed no intent to act. As to the second way of demonstrating dangerousness, relating to a pattern of acts indicating impaired judgment, Michael contends that the evidence is insufficient to support the verdict because the only pattern was a pattern of asking to be taken to a hospital, which he did four times in the span of five days, and because there was not enough other evidence of impaired judgment to satisfy the "substantial probability" requirement.

¶4 The statute does not define "threat." The word's common meanings are "an expression of an intention to inflict injury"[7] and "an indication of impending danger or harm."[8] As mental health scholarship recognizes, "suicidal" is commonly used by persons with intent to act and persons without intent to

---

[6] State v. Perkins, 2001 WI 46, ¶43, 243 Wis. 2d 141, 626 N.W.2d 762 (stating that "[t]he common definition of threat is an expression of an intention to inflict injury on another").

[7] 1868 American Heritage Dictionary of the English Language (3d ed. 1992). This definition was mentioned in Perkins, 243 Wis. 2d 141, ¶43, in which this court distinguished the common definition from the narrower definition for purposes of a statute criminalizing threats to judges.

[8] 1868 American Heritage Dictionary of the English Language (3d ed. 1992).

4

act.[9]  Where credible evidence supports an inference that a person who affirmed that he was suicidal had an intent to act, we will not reverse a jury's dangerousness finding on the grounds that the person was not specific enough in articulating his intent.  Although we need not adopt a precise definition for "threat" for purposes of Wis. Stat. § 51.20, we do conclude that the acts alleged here (which are not in dispute) can satisfy the term's common meanings.

¶5  We turn to the sufficiency of the evidence challenge, and we view the following evidence in a manner that is most favorable to sustaining the verdict: Michael had recently been given a knife and usually carried it with him; after a week of increasingly disturbing and delusional behavior, when a nurse asked if he was "suicidal," he answered that he was; when asked immediately thereafter by his mother to clarify if he had a specific plan to kill himself, he stated that it was too hard to explain; when talking to police officers he answered that he wanted to harm himself; he had a pattern of refusing medication; and he had demonstrated multiple instances of impaired judgment on a daily basis during the preceding week.

---

[9] See infra, ¶36, for discussion of scholarship on suicidal ideation.

¶6 We conclude that an articulated plan is not a necessary component of a suicide threat.[10] If we were to hold otherwise, it would require a person in a confused mental state to articulate a plan before obtaining treatment through involuntary commitment. That would write into the statute a potential barrier to treatment that is inconsistent with its purpose. We also conclude that the evidence was sufficient to support Michael's involuntary commitment because credible evidence existed in the record supporting inferences that there was a substantial probability that he was dangerous to himself within the meaning of Wis. Stat. §§ 51.20(1)(a)2.a., based on threats of suicide or serious bodily harm, and (1)(a)2.c., based on impaired judgment, manifested by a pattern of recent acts.[11]

---

[10] Michael's petition for review stated this issue thus: "Do thoughts of suicide or self-harm, without an articulated plan for acting on those thoughts, constitute 'threats' of suicide or serious bodily harm necessary to establish dangerousness under Wis. Stat. § 51.20(1)(a)2.a.?" Our conclusion is that an articulated plan is not a requirement for a threat of suicide for purposes of the statute.

[11] The special verdict returned by the jury stated as follows:

Question 1: Is Michael [H.] mentally ill? Answer: Yes.

Question 2: If you answered question 1 "yes," then answer this question: Is Michael [H.] dangerous to himself? Answer: Yes.

Question 3: If you answered both questions 1 and 2 "yes," then answer this question: Is Michael [H.] a proper subject for treatment? Answer: Yes.

The jury had been instructed with WI JI-Civil 7050, which included both grounds for dangerousness relevant here.

¶7 Ultimately, our conclusion on the sufficiency of the evidence is dictated by the deferential review of jury verdicts. In such cases, we view the evidence in a light most favorable to the jury's determination. The jury could have drawn another inference from the evidence, but the one it did draw was supported by credible evidence. We will not strike down a jury verdict where we see "credible evidence in the record on which the jury could have based its decision,"[12] and we "accept the particular inference reached by the jury."[13] In light of that standard, we affirm the court of appeals.

## I. BACKGROUND

¶8 The incidents that gave rise to this case occurred when Michael came to Wisconsin for a weeklong family visit in February of 2013. Michael had moved to Minnesota the previous year following a hospitalization in Wisconsin for treatment of a mental illness. Family members said he had told them he did so to avoid a court order that he take anti-psychotic medication. His visit was planned to coincide with celebrations of family birthdays and a belated Christmas gift exchange.

¶9 As the jury heard, it was a difficult week. Michael drove in from Minnesota, arriving at his mother's home about 5:00 a.m. on a Saturday. His mother testified that when she first saw him on Saturday afternoon, his symptoms had returned

---

[12] Morden v. Cont'l AG, 2000 WI 51, ¶38, 235 Wis. 2d 325, 611 N.W.2d 659.

[13] Id., ¶39.

and he had a look in his eyes that reminded her of his appearance prior to his hospitalization.

¶10 On Sunday, he abruptly and without explanation became shaken and distressed and refused to go to the mall for a planned family photo studio appointment.

¶11 On Monday, he walked two miles through very cold weather with his five-year-old niece to demand a car from a sister because he believed that another sister was in danger. Later that day, he asked to go the hospital and was taken but refused medication and did not stay.

¶12 On Tuesday, after a family birthday dinner, he again stated he wanted to go to the hospital and was taken but refused medication and did not stay.

¶13 On Wednesday, he asked to go to the hospital, was taken, refused medication and did not stay. While he was with his father, his mother went to the police department, seeking help. Although the officer contacted the crisis worker, both told her there was nothing that could be done at that point.

¶14 On Thursday, he picked up his niece, age 5, saying they were just going for lunch at McDonald's. They were gone for hours, and repeated calls to his phone were unanswered, which alarmed family members and sent them scrambling frantically to find the child. Family members reached a car repair shop where he had taken his vehicle and learned that he had been there three times but two times did not appear to have the child with him. Michael's sister went to the police for help. When Michael returned to his mother's, the child was safe

with him, but he was oblivious to their worry and furious about several unrelated events, such as clothing he was missing and cell phones he could not activate, which he viewed as proof that unidentified people were following him.

¶15 On Friday evening after dinner, he returned to his mother's house, asking yet again to go to the hospital. As Michael's mother later testified at trial, he told her that evening, "[M]om, something's not right in my head. . . . I can't think straight. I don't know what's going on. I need to go to the hospital . . . ." She testified that when she reminded him that the hospital could not help him if he would not take medication, he did not answer. She described how he went into a bedroom and laid down, and she asked him what was wrong. She testified that, at that point, "He just said I'm so lonely. I don't know what's going on in my head." She said she got him to agree to take medication this time if they went back to the hospital, and she agreed to take him.

¶16 The statements made during that Friday evening emergency room visit are the ones on which Michael's argument primarily focuses. When he arrived at the hospital, the nurse asked him, with his mother nearby, if he was suicidal. He said yes. This answer alarmed his mother; she said he had never made such a statement before. Concerned at this indication that he may have been planning to kill himself, his mother then asked him, as the nurse left to contact a mental health crisis worker, what his plan was. Rather than denying a plan, he responded that it was too hard to explain, it was too long, he could not

9

explain, and he did not know.  Moments later, he took his jacket and ran from the hospital.

¶17  Police officers found him shortly thereafter in a park and returned him to the hospital.  He denied thinking of suicide and told one of the officers that he had only wanted to hurt himself.

¶18  An officer placed Michael under an emergency detention.  Following a probable cause hearing, a jury trial was held to determine whether clear and convincing evidence existed to commit Michael involuntarily for treatment under Wis. Stat. § 51.20.   The jury heard testimony from the emergency room nurse, the police officer who brought Michael back to the hospital, a doctor who examined him prior to trial, and Michael's mother.  Among the evidence heard by the jury were the following facts:

- He had made repeated statements to his mother and sister that "nobody's safe."

- He had acknowledged that he was suicidal to a nurse and made ambiguous statements about being suicidal to his mother.

- He had acknowledged to a police officer that he wanted to harm himself.

- He had delusional behavior and behaved in a paranoid manner, stating to his mother that she and his father should not sleep at home because unnamed persons were after him and would also be after them.

10

- He owned a knife that he had received that week as a belated Christmas gift and usually carried it with him.

- He had access to guns.

- He had walked with a young child through the snow for two miles based on his fear that one of his sisters was in danger.

- He had purchased several cell phones and explained that he did so to avoid being tracked by unnamed persons; he had thrown one phone out the car window believing it to be bugged.

- He had been unable to sleep.

- He had repeatedly told his mother that his head was not right and that he could not think straight and was lonely and sad.

- He had refused medication, and according to a doctor who examined him, he "could [be dangerous] without treatment."

¶19 The jury found that Michael was mentally ill, was a proper subject for treatment, and was dangerous. Based on that verdict, the Outagamie County Circuit Court, the Honorable Dee R. Dyer presiding, issued an order committing Michael involuntarily for treatment for six months.[14]

---

[14] The court made a finding that Michael was incompetent to refuse medication and an order for involuntary medication was also entered; that order was not appealed and is not before us.

¶20 The court of appeals affirmed the jury verdict.[15] As to the dangerousness requirement, it affirmed on the grounds that evidence supported a finding of dangerousness under subsection (1)(a)2.a., relating to threats of suicide or self-harm. In its analysis, it employed a common definition of "threat" as "an expression of an intention to inflict injury" and cited the evidence of Michael's statements that he was thinking of suicide and harming himself, as well as his statements implying that he had a plan to do so even though he refused to share it with his mother because it was "too hard to explain."[16] Because it found the evidence sufficient to satisfy the requirement under subsection (1)(a)2.a., the court of appeals did not address the question of whether evidence was sufficient to satisfy dangerousness grounds under subsection (1)(a)2.c., relating to impaired judgment that leads to a substantial probability of harm to oneself.

## II. STANDARD OF REVIEW

¶21 The standard of review is significant in this case. The challenge is to the sufficiency of evidence to support a jury verdict, and in such a challenge, a reviewing court views evidence most favorably to sustaining a verdict. Tammy W-G. v. Jacob T., 2011 WI 30, ¶17, 333 Wis. 2d 273, 797 N.W. 2d 854. We "review as a question of law whether the evidence presented to a

---

[15] Outagamie County v. Michael H., No. 2013AP1638, unpublished slip op. (Wis. Ct. App. Nov. 26, 2013).

[16] Id., ¶25.

jury is sufficient to sustain its verdict." Sheboygan Cnty. Dep't of Health & Human Services v. Tanya M.B., 2010 WI 55, ¶18, 325 Wis. 2d 524, 785 N.W.2d 369 (citing State v. Booker, 2006 WI 79, ¶12, 292 Wis. 2d 43, 717 N.W.2d 676). "A jury's verdict must be sustained if there is any credible evidence, when viewed in a light most favorable to the verdict, to support it." Id., ¶49. We have emphasized the narrowness of our review in this type of case:

> Our review of a jury's verdict is narrow. Appellate courts in Wisconsin will sustain a jury verdict if there is any credible evidence to support it. Moreover, if there is any credible evidence, under any reasonable view, that leads to an inference supporting the jury's finding, we will not overturn that finding.
>
> In applying this narrow standard of review, this court considers the evidence in a light most favorable to the jury's determination. We do so because it is the role of the jury, not an appellate court, to balance the credibility of witnesses and the weight given to the testimony of those witnesses. To that end, appellate courts search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not. If we find that there is "any credible evidence in the record on which the jury could have based its decision," we will affirm that verdict. Similarly, if the evidence gives rise to more than one reasonable inference, we accept the particular inference reached by the jury. This court will uphold the jury verdict "even though [the evidence] be contradicted and the contradictory evidence be stronger and more convincing."

Morden v. Cont'l AG, 2000 WI 51, ¶¶38-39, 235 Wis. 2d 325, 611 N.W.2d 659 (emphasis added).

¶22 The questions presented about the meaning of the word "threat" in Wis. Stat. § 51.20 require us to interpret the

13

meaning of a statute, and that is a question subject to de novo review. Fond du Lac County v. Helen E.F., 2012 WI 50, ¶10, 340 Wis. 2d 500, 814 N.W.2d 179.

### III. DISCUSSION

#### A. Involuntary Commitment and the History of the Requirement of Dangerousness

¶23 Up until the early 1970s, there were few requirements for the government to meet in order to commit a person involuntarily for mental treatment.

> In 1961, the American Bar Association published an analysis of then-existing state statutes governing involuntary hospitalization. In the late 1950s, just seven states required some sort of dangerousness (to self, others, or property) as justification for involuntary hospitalization. In twenty-two states, simply needing care or treatment was sufficient grounds, and seven other states permitted commitment if it seemed necessary for the patient's welfare or the welfare of others. Massachusetts permitted commitment of persons deemed "likely" to violate "the established laws, ordinances, conventions, or morals of the community." Seventeen states had no specific statutory criteria for commitment, apparently leaving the choice of rationale entirely to legal decision-makers.

Douglas Mossman, M.D. et al., Risky Business Versus Overt Acts: What Relevance Do "Actuarial," Probabilistic Risk Assessments Have for Judicial Decisions on Involuntary Psychiatric Hospitalization?, 11 Hous. J. Health L. & Pol'y 365, 373-76 (2012) (footnotes omitted). Wisconsin's statutory scheme for involuntary commitment at that time was characterized as follows:

14

it failed to require effective and timely notice of "charges" justifying detention; failed to require notice of rights including right to jury trial, permitted detention longer than 48 hours without hearing on probable cause; permitted detention longer than two weeks without full hearing on necessity for commitment; permitted commitment based on hearing in which person detained was not represented by adversary counsel, at which hearsay evidence was admitted, and in which psychiatric evidence was presented without patient having been given benefit of privilege against self-incrimination; permitted commitment without proof of mental illness and dangerousness beyond reasonable doubt; and failed to require those seeking commitment to consider less restrictive alternatives.[17]

¶24 Then, two cases changed the landscape of involuntary commitment law dramatically. One was O'Connor v. Donaldson,[18] which held that in order to commit a person involuntarily, the state must prove that a mentally ill person was "dangerous to himself or others":

> The modern history of involuntary commitment began with the Supreme Court decision in O'Connor v. Donaldson in 1975. Donaldson, diagnosed with paranoid schizophrenia, was kept in a state-run mental hospital for nearly fifteen years following an involuntary commitment initiated by his father. He repeatedly asked for his release, arguing that he was not being treated for his mental condition and did not pose a danger to himself or others.
>
> The Supreme Court agreed, holding that in order to constitutionally commit and confine an individual, the state must show that the person is dangerous to himself or others and that they are not capable of living safely under the supervision of family or friends.

---

[17] Lessard v. Schmidt, 349 F. Supp. 1078 (E.D. Wis. 1972) (vacated and subsequently reinstated).

[18] O'Connor v. Donaldson, 422 U.S. 563 (1975).

15

Dan Moon, The Dangerousness of the Status Quo: A Case for Modernizing Civil Commitment Law, 20 Widener L. Rev. 209, 212 (2014) (footnotes omitted).

¶25 The other was Lessard v. Schmidt,[19] a Wisconsin case that established substantive and procedural rights for those undergoing commitment procedures. In that case, a federal three-judge panel held that in order to satisfy due process guarantees, persons subject to involuntary commitment proceedings were entitled to written and oral notice of various rights, a probable cause hearing within a limited period of time with appointed counsel, written notice of the final hearing, and a full hearing within 14 days of the original detention.

¶26 The case is regarded as groundbreaking. The Wisconsin Supreme Court called the change resulting from Lessard "radical":

---

[19] The case has a complicated procedural history, but the substance of its holding was never overruled; the original order was altered to add more specificity and ultimately reinstated. The first order, Lessard v. Schmidt (Lessard I), 349 F.Supp. 1078 (E.D. Wis. 1972), generally held that the state's existing involuntary commitment statutory scheme was unconstitutional. When the order was appealed, the United States Supreme Court held that the injunctive relief granted needed to be specific and remanded to the district court for that purpose. Lessard II, 414 U.S. 473 (1974)). On remand, in Lessard III, 379 F.Supp. 1376, 1380-82 (E.D. Wis. 1974), the district court stated the injunctive relief from its original order in more specific terms. When the case was again appealed, the United States Supreme Court remanded for further consideration in light of another recently decided case. Lessard IV, 421 U.S. 957 (1975). On remand, the district court reinstated the prior order of the court. Lessard V, 413 F.Supp. 1318 (E.D. Wis. 1976).

16

> Wisconsin law regarding the institutionalization of the mentally disabled underwent radical change with the landmark federal district court decision in Lessard v. Schmidt, in which Wisconsin's involuntary civil commitment law was held unconstitutional. In response to Lessard, the legislature enacted three new civil commitment laws . . . [including] one for persons who are acutely mentally ill . . . . [T]hese laws authorize court ordered institutionalization of mentally disabled individuals for the purpose of care and custody.

Watts v. Combined Cmty. Servs. Bd. of Milw. Cnty., 122 Wis. 2d 65, 72, 362 N.W.2d 104 (1985) (citations omitted).   But the changes reverberated far beyond Wisconsin.   "Lessard's legal model launched a sweeping trend toward stricter commitment criteria and greater procedural protection not only in the courts, but in the state legislatures as well."   Ronald L. Wisor, Jr., Community Care, Competition and Coercion: A Legal Perspective on Privatized Mental Health Care, 19 Am. J.L. & Med. 145, 150 (1993).

> Passage of . . . statutes [encouraging community treatment rather than institutionalization] coincided with several court decisions that elaborated the substantive and procedural due process rights of individuals subject to civil commitment. . . . [T]he most significant of these cases is Lessard v. Schmidt, a 1972 Wisconsin federal district court decision that sparked a nationwide transformation in civil commitment statutes.

Mossman, supra at 373-376 (footnotes omitted).

¶27 Lessard's requirements have generally stood the test of time, although the burden of proof it imposed was lowered in a subsequent case by the United States Supreme Court to the

"clear and convincing evidence" standard.[20] <u>Addington v. Texas</u>, 441 U.S. 418, 419-20 (1979).

B. What it Takes to Satisfy the Wisconsin Statute's

Requirement of Dangerousness

¶28 As noted, Wisconsin involuntary commitment statutes, which did not previously contain a requirement of dangerousness, were accordingly revised. Wisconsin Stat. § 51.20, the

---

[20] The United States Supreme Court's analysis on the issue is summarized thus:

> The question of what standard of proof courts should apply to satisfy the Due Process Clause of the Fourteenth Amendment in an involuntary civil commitment proceeding remained unanswered until the Supreme Court addressed the issue in <u>Addington v. Texas</u>, 441 U.S. 418, 419-20, 432-33 (1979). . . . The Court balanced the individual's interest in not being involuntarily committed for an open-ended period of time against the state's interest in confining the dangerous mentally ill. The Court carefully considered the criminal standard of proof of "beyond a reasonable doubt" but rejected that standard, finding it practically impossible to prove in the context of the uncertain and imperfect character of psychiatric diagnosis. The Court similarly rejected the "preponderance of the evidence" standard as too minimal to satisfy due process requirements, given the serious deprivation of freedom involved in the involuntary civil commitment process. Instead, the Court held that the intermediate standard of "clear and convincing" satisfies due process requirements in cases of involuntary civil commitment.

Alison Pfeffer, <u>"Imminent Danger" and Inconsistency: The Need for National Reform of the "Imminent Danger" Standard for Involuntary Civil Commitment in the Wake of the Virginia Tech Tragedy</u>, 30 Cardozo L. Rev. 277, 285-86 (2008) (citations omitted).

involuntary commitment statute, requires the county to prove by clear and convincing evidence that the individual whose commitment is sought is mentally ill and is a proper subject for treatment, and that the person is dangerous to himself or herself, or others. Wis. Stat. §§ 51.20(1)(a)1., (1)(a)2.

¶29 The statute identifies five ways the county can meet its burden to prove dangerousness, two of which are relevant here. (As previously noted, Michael does not contest that he meets the first qualification for commitment, that he is mentally ill and a proper subject for treatment.)

¶30 The County can demonstrate that "[t]he individual is dangerous because he or she . . . [e]vidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." Wis. Stat. §51.20 (1)(a)2.a.

¶31 The County can also demonstrate dangerousness by showing clear and convincing evidence of a pattern of acts showing such impaired judgment that he was dangerous to himself:

> The individual is dangerous because he or she . . . [e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself. The probability of physical impairment or injury is not substantial under this subd. 2. c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, if the individual may be provided protective placement or protective services under ch. 55 . . . .

Wis. Stat. §51.20 (1)(a)2.c.

19

C. Whether Credible Evidence Supported the Commitment Under

2.a., Relating to Threats of Suicide or Self-harm

¶32 The first of Michael's challenges is to the jury's verdict that the evidence was sufficient to find him dangerous if that is demonstrated under the (1)(a)2.a. standard, which bases dangerousness on "recent threats of . . . suicide or serious bodily harm." The evidence that he answered "yes" when he was asked if he was suicidal is not evidence of a recent threat of suicide, he contends, because thoughts are not threats and because he took no act in furtherance of the thoughts. He points to the common definition of "threat" cited in State v. Perkins, "an expression of an intention to inflict injury,"[21] and argues that his statements fall short of expressing "an intention." He cites to two cases to illustrate the contrast between specific intentional plans and a lack of evidence of specific dangerous conduct. In support of the former, he cites R.J. v. Winnebago County, 146 Wis. 2d 516 (Ct. App. 1988), in which the court held that graphic threats to seriously harm another person were sufficient to support involuntary commitment even if the intended person was unaware of the threat. As an illustration of the latter, he cites to Milwaukee County v. Cheri V., unpublished slip op. (Ct. App., Dec. 18, 2012), which held that evidence was insufficient on the dangerousness prong where all the evidence showed was that the person was upset,

---

[21] Perkins, 243 Wis. 2d 141, ¶43.

20

angry, and agitated but made no statements regarding harm to herself or others.[22]

¶33 The County argues that the evidence on this point was sufficient to support the verdict. It argues that the four witnesses were credible. It notes that he answered that he was suicidal, and in a separate conversation he told police he wanted to harm himself, and those answers did constitute evidence of a threat of suicide or serious bodily harm. The County notes that in addition to the narrow definition of "threat" discussed by Michael, the word has common meanings that are more broad, such as "an indication of impending danger or harm." It also argues that in response to his mother's question about a suicide plan, it would have been reasonable to expect him to deny having a plan, if that were the case; instead, his answers were evasive, and he fled the room. The County argues that a narrow interpretation of the word "threat" would undermine the purposes of the involuntary commitment statute by limiting such commitments to situations where a person articulates a clear intention of plans for self-harm.

---

[22] Michael also cites to two involuntary commitment cases from the Oregon Court of Appeals as instructive. Michael does not address the fact that the statutes involved, Oregon Rev. Stats. §§ 426.005 and 426.130, differ significantly from the Wisconsin statute; the statute does not provide what constitutes grounds for a finding of dangerousness, for example, so there is no provision comparable to the ones we consider here. For that reason the cases are of little help in interpreting the provision concerning threats of self-harm in Wis. Stat. § 51.20.

¶34 As noted, the statute does not define "threat." Perkins merely recited a common meaning of the word in contrast to the more narrow meaning given to it in a particular criminal statute; therefore, that case provides little guidance for purposes of defining "threat" in this context. The ordinary definitions of threat include "an indication of impending danger or harm," and under that definition, the jury could reasonably have considered Michael's statements to be threats.

¶35 As the County correctly points out, one of the purposes of Chapter 51 is to facilitate treatment for the dangerous mentally ill who will benefit from it. It would be unreasonable to expect a person who is in a poor or confused mental state to be capable of making a clear and coherent statement of intention of what his or her plans are. Doing so would render the statute unworkable for the very people for whom it is designed.

¶36 Michael did undisputedly acknowledge that he was suicidal. The meaning of "suicidal," according to mental health professionals and established instruments for treatment, encompasses both suicidal ideation that is without intent and suicidal ideation that is made with intent to harm. The Columbia Suicide Severity Rating Scale (C-SSRS)[23] is a

---

[23] The Columbia Suicide Severity Rating Scale (C-SSRS) "involves a series of probing questions to inquire about possible suicidal thinking and behavior." 3 Draft Guidance For Industry Suicidality: Prospective Assessment Of Occurrence In Clinical Trials, Food and Drug Administration, Center for Drug Evaluation and Research (September 2010).

questionnaire in extensive use by mental health professionals to assess suicide risk. In the category of "suicidal ideation," the scale lists five categories, some without intent to act and some with intent to act: "wish to be dead," "suicidal thoughts," "suicidal thoughts with method (but without specific plan or intent to act)," "suicidal intent (without specific plan)," and "suicidal intent with specific plan." There is extensive debate in the mental health treatment community about how to predict which suicidal patients are at highest risk of killing themselves.[24] It is within the realm of ordinary experience that some suicidal people have an intent to follow through and harm themselves and others do not. The jury could have drawn the inference from Michael's statement and the other evidence presented that he was not making a "threat of suicide or bodily harm." But it did not draw that inference.

¶37 We see no reason to hold that an articulation of a specific plan is necessary in order to constitute a threat for purposes of this statute. Therefore, we conclude that the

---

[24] The challenge posed by the lack of useful, universal nomenclature for the study and prevention of suicide was discussed in one seminal academic writing that noted what it called "a basic, almost incredible reality: Despite hundreds of years of writing and thinking about suicide, and many decades of focused suicide research, there is to this day no generally accepted nomenclature for referring to suicide-related behaviors——not even at the most basic, conversational level." Patrick W. O'Carroll, et al., 238 Beyond the Tower of Babel: A Nomenclature for Suicidology, Suicide and Life-Threatening Behavior, Vol. 26(3), Fall 1996.

verdict as to the basis in Wis. Stat. § 51.20 (1)(a)2.a. is supported by credible evidence and we will not disturb it.

D. Whether Credible Evidence Supported the Commitment Under 2.c., Relating to a Pattern of Acts Indicating Impaired Judgment

¶38 Wisconsin Stat. § 51.20 (1)(a)2.c., the second grounds for dangerousness relevant here, states:

> The individual is dangerous because he or she . . . [e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself. The probability of physical impairment or injury is not substantial under this subd. 2. c. if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services, if the individual may be provided protective placement or protective services under ch. 55 . . . .

The question is therefore whether the evidence was sufficient to support the jury's finding that Michael was dangerous to himself if that finding was based on facts demonstrating that he had shown "such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there [was] a substantial probability of physical impairment or injury to himself or herself."

¶39 We repeat the evidence noted above that the jury heard about Michael's behavior because in this case, the same evidence supporting the finding of dangerousness demonstrated under (1)(a)2.a. also supports a finding of dangerousness demonstrated under (1)(a)2.c. because the pattern of his paranoia and

24

increasing distress is relevant to both ways of demonstrating dangerousness:

- He had made repeated statements to his mother and sister that "nobody's safe."

- He had acknowledged that he was suicidal to a nurse and made ambiguous statements about being suicidal to his mother.

- He had acknowledged to a police officer that he wanted to harm himself.

- He had delusional behavior and behaved in a paranoid manner, stating to his mother that she and his father should not sleep at home because unnamed persons were after him and would also be after them.

- He owned a knife that he had received that week as a belated Christmas gift and usually carried it with him.

- He had access to guns.

- He had walked with a young child through the snow for two miles based on his fear that one of his sisters was in danger.

- He had purchased several cell phones and explained that he did so to avoid being tracked by unnamed persons; he had thrown one phone out the car window believing it to be bugged.

- He had been unable to sleep.

- He had repeatedly told his mother that his head was not right and that he could not think straight and was lonely and sad.

25

- He had refused medication, and according to a doctor who examined him, he "could [be dangerous] without treatment."

¶40 Michael argues that the only pattern of recent acts was the repeated trips to the hospital to seek help. But as the facts recited above make clear, other inferences could also be drawn about patterns of recent acts that week. The jury was not obligated to see only the pattern Michael describes. Jurors might reasonably have seen a pattern of delusional paranoia, a pattern of telling family members that people were out to get him, a pattern of refusing medication and rejecting medical treatment, a pattern of telling people that something was wrong with his head, and so on. Based on the testimony they heard about the week's events, there was credible evidence from which jurors could conclude that Michael's symptoms were worsening and he was becoming distressed to the point that there was a substantial probability of injury to himself——the testimony of Michael's mother, for instance, made clear that the statement he made to the nurse was the first time he had ever spoken of suicide.

¶41 We also note that this provision of the statute makes an exception for a person exhibiting such judgment "if . . . there is a reasonable probability that the individual will avail himself . . . of [community] services." Wis. Stat. § 51.20(1)(a)2.c. Although there was evidence of Michael's repeated trips to the hospital during the week, there was also overwhelming evidence that he was unwilling to take medication and to avail himself of the help that was offered. The evidence

26

showed that on three occasions he left after going to a hospital without accepting medication. The evidence showed that on the fourth visit to a hospital, he left almost immediately, following an intake interview, before a doctor or crisis worker could be summoned. We decline to hold that, as a matter of law, merely going to a hospital and declining help satisfies the statute's exception concerning a person's willingness to avail himself of community services; nor does Michael assert that we should.

¶42 Viewing the evidence most favorably to the jury verdict, we conclude that credible evidence supports the verdict if dangerousness is based on the grounds stated in Wis. Stat. 51.20(1)(a) 2.c.

## IV. CONCLUSION

¶43 We conclude that an articulated plan is not a necessary component of a suicide threat. If we were to hold otherwise, it would require a person in a confused mental state to articulate a plan before obtaining treatment through involuntary commitment. That would write into the statute a potential barrier to treatment that is inconsistent with its purpose. We also conclude that the evidence was sufficient to support Michael's involuntary commitment because credible evidence existed in the record supporting inferences that there was a substantial probability that he was dangerous to himself within the meaning of Wis. Stat. §§ 51.20(1)(a)2.a. and (1)(a)2.c.

27

¶44  Ultimately, our conclusion is dictated by the deferential review of jury verdicts.  In such cases, we view the evidence in a light most favorable to the jury's determination. The jury could have drawn another inference from the evidence, but the one it did draw was supported by credible evidence.  We will not strike down a jury verdict where we see "credible evidence in the record on which the jury could have based its decision,"[25] and we "accept the particular inference reached by the jury."[26]  In light of that standard, we affirm the court of appeals.

*By the Court.*—Affirmed

---

[25] <u>Morden</u>, 235 Wis. 2d 325, ¶39.

[26] <u>Id.</u>