COURT OF APPEALS
DECISION
DATED AND FILED

June 22, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP51**

STATE OF WISCONSIN

Cir. Ct. No. **2021ME424**

IN COURT OF APPEALS
DISTRICT III

---

IN THE MATTER OF THE MENTAL COMMITMENT OF S. P.:

BROWN COUNTY,

    PETITIONER-RESPONDENT,

 V.

S. P.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Brown County: BEAU LIEGEOIS, Judge. *Affirmed.*

¶1 GILL, J.[1] Steve[2] appeals from an order for commitment entered pursuant to WIS. STAT. ch. 51. Steve argues that Brown County ("the County")

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

failed to establish that he was dangerous under WIS. STAT. § 51.20(1)(a)2.a. We conclude the County proved by clear and convincing evidence that Steve was dangerous, and we therefore affirm.

## BACKGROUND

¶2 In July 2021, Steve returned to his home after completing treatment at an alcohol rehabilitation facility. Steve failed to maintain his sobriety, and his behavior over the weekend of July 9 caused his wife Carol to call the police two separate times. Steve was ultimately placed on an emergency detention after sending text messages to his family with statements like "goodbye," disappearing from his home for over a day, and then returning home intoxicated and wearing his T-shirt inside-out.

¶3 At the final commitment hearing, psychiatrist Marshall Bales testified regarding his examination of Steve and his review of records relevant to Steve's behavior. Bales testified that he believed that Steve had bipolar disorder and described the symptoms of Steve's illness:

> He's had psychotic symptoms with it and—but mainly very severe mood swings, highs and lows in moods, irritability, lability, depression, and then he's also heard voices more recently. But he's had mood swings off and on for years, yet the whole presentation has been worse lately and then also complicated by some alcohol use problems.

Bales explained that although Steve exhibited most of the above symptoms during the examination, because Steve was a police officer, "he knows all about exactly

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials. We also use pseudonyms when referring to other persons relevant to this appeal to protect their privacy.

why I was there for the Chapter 51 matter." Bales noted that as a result, Steve is "very intelligent, but he was trying to downplay, minimize, and even rationalize all of the events leading to this hospitalization and this extensive police involvement scenario and such." Bales testified that Steve admitted to hearing voices and that Carol had confirmed as much, although Steve was not hearing voices at the time of Bales' examination of him.

¶4 Doctor Bales testified that during the examination, Steve confirmed the events outlined in the statement of detention in their entirety. When asked, "Did [Steve] specifically admit that he had a plan to end his life?" Bales did not provide a yes or no answer. Instead, Bales reiterated that Steve had confirmed the events set forth in the statement of detention, and Bales summarized those facts as follows:

> [Steve] sent messages to his family stating good-bye, stating—I'm paraphrasing this. He said he was going to leave the house and be out of the world. He left Rockford Rehab, stopped his medication, and wanted no police presence at his house, and then there's a few more things. And he said [to another deputy] if you come out to my house, you better bring a gun belt. He confirmed that. And then [the statement of detention] said, yesterday he told his wife he was going to disappear. He left at about 12:00 a.m. and returned later wearing underwear and a shirt, a T-shirt inside out. He confirmed this.

In explaining Steve's confirmation of these events, Bales stated, "He said he had been drinking too much when he said it, but he said it did happen." Bales confirmed that Steve's mental illness and the admissions he had made—including his statement about a deputy bringing a gun belt and his admission to hearing voices—were separate from his drinking problem. While Bales noted that Steve's presentation was complicated by his alcohol use problems, Bales testified, "in my opinion, this is about far more than his abuse of alcohol."

¶5    Doctor Bales further testified that he believed that Steve was stable enough to be placed on outpatient treatment. Bales then clarified, "I would defer the timing to the Court or his team, but he was not suicidal or violent when I met with him. He was cordial, he was pleasant."

¶6    Carol testified next. She recounted that she first called the police on July 9 after not hearing from Steve, who had begun drinking again. Carol explained that after law enforcement arrived, she told them that Steve was sleeping downstairs. The officers would not enter the house, however, due to a previous situation unknown to her, one that she declined to talk about at the hearing because it was "secondhand." Thereafter, she again asked the officers to talk with Steve, as he was "just sleeping" downstairs; however, they refused. After Steve drank more throughout the day, Carol testified that Steve "was just getting belligerent and I wanted him out of the house." Carol called the police a second time on July 9 at around 8:00 p.m., but they again refused to enter her home. Ultimately, Carol barricaded herself in her bedroom by placing a side table in front of the door. However, Carol testified that she "was not scared of [Steve]. He wasn't going to hurt me. He was obnoxious. He was a drunk, obnoxious person."

¶7    Carol further explained that she had removed in excess of twenty guns from their home at the advice of Steve's brother. She also stated that she had been in constant contact with Steve's brother to try to figure out what steps to take regarding Steve, as Steve's relapse with alcohol was a "scary, sad, situation." In addition, Carol confirmed that on July 10, the day after she had barricaded herself in her room, Steve admitted to her that he had been hearing voices.

¶8 Carol testified that later that weekend, while she was in Madison attending a funeral, Steve's brother called to let her know that Steve had started drinking again. When she arrived home later that night, she assumed that Steve was home because his truck was there, and when she looked in the basement, she thought he was sleeping there. At lunch the next day, Carol came home to check on Steve, but he was not there. After talking with Steve's brother and determining that they needed to find Steve, Carol spoke with a friend of Steve's, who was also a deputy. Steve's deputy friend then talked to law enforcement to "get [Steve's] phone pinged" so they could find Steve. On Monday morning, Steve arrived home intoxicated, wearing shorts and a T-shirt that was on both backward and inside-out.[3]

¶9 Kevin, who had known Steve since junior high, testified next. He explained that he had called Steve on Sunday afternoon to see if he wanted to go to Michigan, and Steve had asked to be picked up because he had been drinking and could not drive. While Kevin was driving, Steve hit him "eight to ten times throughout the evening" and knocked off Kevin's glasses. In addition, Steve asked Kevin to turn onto narrow rural roads in Michigan several times. When Kevin finally made the requested turn, Steve had him pull the car over, but did not explain why he did so, and simply agreed when Kevin suggested they get back on the main road. Additionally, Steve requested that they perform certain evasive maneuvers to avoid persons he thought were following him, leaving Kevin confused and concerned. Kevin testified that there were times during the night

---

[3] Although Dr. Bales described Steve as arriving home in his underwear, Carol refuted that description, stating: "[H]e was not in his underwear, as was stated by the doctor. He was in shorts."

when Steve said "goodbye" to him: "I asked [Steve] what he meant and he got angry with me. And I said, I'm sorry to upset you, but when people say things like that, they are usually thinking about suicide, and [Steve] just ignored it." Kevin confirmed that Steve did not specifically express to him that he was planning to commit suicide.

¶10     Following the witnesses' testimony, the circuit court concluded that Steve had a mental illness that was being amplified by alcohol and that Steve suffered from psychotic behavior, mood swings, irritability, and depression. The court noted Dr. Bales' testimony that Steve had been hearing voices and that his presentation had been worsening. In addition, the court found that "[Steve] was downplaying, minimizing, and rationalizing the mental illness diagnosis and blaming it on drinking too much."

¶11     The circuit court further concluded that Steve was a significant danger to himself, based upon his statements and the context for those statements that was provided through the testimony at the hearing. Specifically, the court reasoned:

> He's talking about leaving this world and then making a statement to the Brown County Deputy that if they come up to his house, they better bring a gun belt. And I know we are basing this on [Steve] acknowledging that he made that statement…. And I believe that's a very significant statement to make from somebody who now we have a doctor saying that does have a mental illness, that that makes [Steve] a significant danger to himself requiring a commitment and treatment. The only reason I think the guns in the home are relevant in this case is that it verifies that there was an opportunity to carry out the threat that if they come to his home that they better bring a gun belt.

Following the above analysis, the court ultimately stated: "I think that's a very clear manifestation of somebody … describing a suicide by police officer type

6

situation." The court further explained that under the statute, a threat of suicide or serious bodily harm is sufficient to meet the dangerousness standard.

¶12 The circuit court ordered Steve's involuntary commitment on an outpatient basis but it declined to enter an accompanying order for involuntary medication and treatment, concluding that Steve had the capability to understand his medications and make his own decisions regarding those medications. This appeal follows. We include additional facts below as relevant to our discussion.

## DISCUSSION

¶13 Steve argues, and the County concedes, that this appeal is not moot. We generally do not consider moot issues. *State ex rel. Olson v. Litscher*, 2000 WI App 61, ¶3, 233 Wis. 2d 685, 608 N.W.2d 425. An issue is moot when its resolution will have no practical effect on the underlying controversy. *Id.* Although Steve's commitment expired in early 2022 and the County did not seek to extend it, he is still subject to a lasting collateral consequence in the form of a firearms ban. Because Steve is still subject to this collateral consequence of his commitment, a decision voiding his commitment would have a practical effect on the underlying controversy. *See Marathon County v. D.K.*, 2020 WI 8, ¶25, 390 Wis. 2d 50, 937 N.W.2d 901. Accordingly, this appeal is not moot.

¶14 In a WIS. STAT. ch. 51 proceeding, a petitioner has the burden to prove by clear and convincing evidence that a subject individual is mentally ill, a proper subject for treatment, and dangerous to himself or herself, or to others. *See* WIS. STAT. § 51.20(1)(a), (13)(e). Whether this burden has been met presents a mixed question of fact and law. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* Whether these findings satisfy the statutory

standards is a question of law we review de novo. *Id.* Steve does not contest the court's findings that he was mentally ill and a proper subject for treatment. He argues only that the County failed to present clear and convincing evidence that he was a danger to himself under § 51.20(1)(a)2.a., the subsection on which the court based its commitment decision.

¶15 A petitioner may prove that a person is dangerous and warrants commitment under any of the five standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. *See Langlade County v. D.J.W.*, 2020 WI 41, ¶30, 391 Wis. 2d 231, 942 N.W.2d 277. To establish that a person is dangerous under § 51.20(1)(a)2.a. in a commitment proceeding, the County must prove by clear and convincing evidence that the person "[e]videnes a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." § 51.20(1)(a)2.a. The term "substantial probability" means "much more likely than not." *D.K.*, 390 Wis. 2d 50, ¶35 (citation omitted).

¶16 Steve argues that the statements he made did not constitute "threats" under the statute because they were too ambiguous to show that he intended to act upon them. We disagree.

¶17 Steve attempts to distinguish his circumstances from those in *Outagamie County v. Michael H.*, 2014 WI 127, 359 Wis. 2d 272, 856 N.W.2d 603, in which our supreme court addressed the proof of "evidence of recent threats of … suicide" required under WIS. STAT. § 51.20(1)(a)2.a. In *Michael H.*, Michael exhibited a number of delusional and paranoid behaviors over the course of a week, asking to be taken to the hospital a number of times but in each instance refusing treatment and leaving. *Michael H.*, 359 Wis. 2d 272, ¶¶11-13, 18. When

transported to the hospital a final time, a nurse asked Michael whether he was suicidal, to which he responded "yes." *Id.*, ¶16. When asked by his mother what his plan to commit suicide was, Michael responded "that it was too hard to explain, it was too long, he could not explain, and he did not know." *Id.* Although Michael later argued that this statement was a "thought" and not a "threat" of suicide because he had no intent to act on his thoughts, the court reasoned that the ordinary definitions of the word "threat" included "an indication of impending danger or harm." *Id.*, ¶34. Under this definition, the court concluded that the jury could have considered Michael's statements to be "threats" of suicide. *Id.*

¶18 In addition, our supreme court refused to conclude that "an articulation of a specific plan is necessary in order to constitute a threat" for the purposes of WIS. STAT. § 51.20(1)(a)2.a. *Michael H.*, 359 Wis. 2d 272, ¶37. The court explained that it would be unreasonable to expect a person already in a "poor or confused mental state" to be capable of making a clear indication of what his or her intent was. *Id.*, ¶35. Instead, the court concluded that "[w]here credible evidence supports an inference that a person who affirmed that he [or she] was suicidal had an intent to act, we will not reverse a jury's dangerousness finding on the grounds that the person was not specific enough in articulating his [or her] intent." *Id.*, ¶4.

¶19 Steve argues that unlike in *Michael H.*, he never affirmed to anyone that he was suicidal or wanted to harm himself in any way, and, as a result, the statements he made were too ambiguous for the circuit court to conclude that he had an intent to act upon them. However, *Michael H.* does not require that a person explicitly make a statement such as "I wish to commit suicide" in order for his or her statement to be considered a threat of suicide. Rather, the person's

9

statements must have evidenced "an indication of impending danger or harm." *Id.*, ¶34.

¶20 Moreover, and contrary to Steve's argument, Dr. Bales' examining report reveals that Steve *did* make explicit threats of suicide.[4] In his report, Bales notes that Steve "minimized, rationalized and downplayed events, but did admit he had made *suicidal comments and threats* whether sober or not." (Emphasis added.) This evidence strongly supports the circuit court's dangerousness conclusion grounded in Steve's risk of harming himself, and refutes the distinction Steve attempts to draw between his circumstances and those in *Michael H.* Although Steve "den[ied] current suicidal or threatening behaviors" during the examination, Bales noted that Steve had been having both hallucinations and "various amounts of suicidal ideation for quite some time." Bales' report therefore belies Steve's assertion that *Michael H.* is distinguishable because, unlike the subject individual in that case, Steve never expressed that he was suicidal.

¶21 We note that, unlike in Michael H., Steve did not admit to Dr. Bales that he was currently suicidal. However, Bales specifically concluded that because Steve was a police officer, he was "intimately familiar with the [WIS. STAT.] chapter 51 process and has used that to avoid mental health care in general." Bales further testified that Steve "is trying to downplay events as he has done for years." Bales also opined that Steve was attempting to "minimize, and even rationalize all the events leading to [his] hospitalization." Under these circumstances, it is unlikely that in a conversation with an examining mental

---

[4] Doctor Bales' report was entered into evidence at the final hearing, and we can therefore consider it.

health professional, Steve would have explicitly stated that he was currently "suicidal," as he was aware of the commitment consequences that could stem from the conversation.

¶22 Furthermore, in his report, Dr. Bales described a "detailed" phone call that he had with Carol during Steve's examination, a call made at Steve's request. During the call, Carol "admitted calling 911 on July 9 with [Steve's] worsening psychotic behavior with alcohol consumption." Moreover, she explained that Steve "had been naked and intoxicated making *very suicidal threats* in the garage that day." (Emphasis added.) Neither this call nor Steve's direct admission of past suicidal threats were addressed at the final hearing. However, when taken together with the gun belt comment and the remainder of the erratic and "degenerating" behavior described above, we conclude that Steve's threats were not ambiguous but instead manifested a substantial probability that he would harm himself. We therefore conclude the County presented sufficient evidence to establish, by clear and convincing evidence, that Steve was dangerous under WIS. STAT. § 51.20(1)(a)2.a.[5]

¶23 We further disagree with Steve's argument that his comment regarding a deputy bringing a gun belt was too ambiguous to be considered a threat, or did not amount to an intention to act. The circuit court's finding that

---

[5] We acknowledge that some of the descriptions of Steve's behavior over the course of the weekend, although odd, did not amount to threats of suicide. For example, we reject the County's argument that Steve was attempting to commit suicide when he hit his friend Kevin's glasses from his face while Kevin was driving, simply because Kevin could not see without his glasses. Although Steve's behavior was concerning to Kevin, Kevin did not allege (and nothing in the record suggests) that Steve was attempting to crash the car or commit suicide by knocking off Kevin's glasses. Although not all of Steve's behavior is relevant to our dangerousness analysis, the evidence ultimately supports a finding of dangerousness under WIS. STAT. § 51.20(1)(a)2.a.

Steve's comments were a threat of "suicide by police officer" is supported by witness testimony at the final hearing. Carol made it clear that responding officers refused to enter the home two separate times when called during the weekend at issue. Both of these visits occurred after Steve made a comment to a deputy about the deputy needing to bring his gun belt if he wanted to come to his house. The court reasonably concluded from both Steve's comment and the officers' responses that the officers were afraid Steve would follow through on his threat. The court also made the reasonable conclusion that Steve had been referring to a "suicide by cop" scenario in making the comment to the deputy. To the extent the court's finding is one of fact, we uphold it unless it is clearly erroneous—and here the court's finding is supported by the record. *See J.W.J.*, 375 Wis. 2d 542, ¶15. The seriousness of Steve's threat is further magnified by another comment Dr. Bales made in his report, detailing that Steve "was also noted to have attempted to get another deputy to shoot him by suicide by cop ten years prior." In line with the court's finding, we conclude that the record supports a conclusion that Steve's statement requesting officers bringing a gun belt when coming to his home was a serious threat of suicide, manifesting a substantial probability of harm to Steve.

¶24 Following our supreme court's decision in *Michael H.*, this court examined what circumstances constituted a "threat" of suicide in *Marathon County v. T.A.T.*, No. 2019AP1709, unpublished slip op. (WI App June 29, 2021).[6] There, Travis, who had reportedly fallen near a lake, "continuously said over and over again that he wanted [responding police officers] to leave him alone,

---

[6] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

12

leave him there to die, that he just wanted it all to be over." *Id.*, ¶4. Travis argued that his statements about being left to die did not constitute explicit threats of suicide but we determined that his statements constituted an "indication of impending danger or harm" under the definition adopted in *Michael H. T.A.T.*, No. 2019AP1709, ¶25. We based this conclusion on Travis's statements, taken in conjunction with experts' reports making it clear Travis was dangerous due to his risk of suicide stemming from prior suicide attempts and his mental illness, and specific thoughts that Travis admitted he experienced about killing himself by drowning. *Id.*, ¶¶25-26. Our holding in *T.A.T.* makes it further evident that an "indication of impending danger or harm" constituting a threat under WIS. STAT. § 51.20(1)(a)2.a. may be found through statements and circumstances other than explicit threats of suicide or admissions of suicidal thoughts, such as Steve's comment regarding the gun belt.

¶25 Steve makes a similar argument to one we rejected in *T.A.T.*, claiming that his statements fell short of threats, in part, because he was heavily intoxicated throughout the course of the weekend prior to his detention. He correctly points out that the definition of "mental illness" for the purposes of a WIS. STAT. ch. 51 commitment "does not include alcoholism," and he claims that the statements he made were simply a result of his drinking. *See* WIS. STAT. § 51.01(13)(b). Steve contrasts his behavior to the factual circumstances relied upon by the court in *T.A.T.* in finding Travis to be dangerous. Steve argues that in *T.A.T.*, this court concluded that the county was only able to prove that Travis's statements were more than "drunken ramblings" because Travis had admitted to a doctor that he had been suicidal. *T.A.T.*, No. 2019AP1709, ¶26. Without such an admission here, Steve argues that the County cannot prove that his statements were not merely the result of his intoxication.

¶26    This argument is unavailing, as Dr. Bales clearly stated in his report that Steve "minimized, rationalized and downplayed events, but did admit he had made suicidal comments and threats *whether sober or not*."  (Emphasis added.) This statement alone evidences that Steve's behavior and comments cannot be fully attributed to his drinking.  Bales' conclusion also refutes Steve's argument that his circumstances are different than those in *T.A.T.* on the premise that he did not admit to a doctor that he had been suicidal.  In addition, Bales testified that "[Steve] downplayed [the statements he had made,] stating it was from him drinking too much, which it was.  But the thing is … that in my opinion, this is about far more than his abuse of alcohol."  Steve argues this latter statement only goes to a description of his mental illness.  However, it is evident from a plain reading of Bales' oral statement—and written statements in his report—that he concluded Steve's threats were not solely made because he had been drinking.  As in *T.A.T.*, this professional medical opinion supports our conclusion that Steve's statements were not mere "drunken ramblings," but were instead actionable threats of suicide.  *See id.*, ¶26.

¶27    In sum, to the extent that there is a question about whether Steve made direct threats of suicide during the weekend in question, the evidence supports the conclusion that Steve did, and was dangerous as defined under WIS. STAT. § 51.20(1)(a)2.a.  Steve's statements evidenced "an indication of impending danger or harm," and according to Dr. Bales, were not solely attributable to his consumption of alcohol.

¶28    Steve next argues that the County did not prove there was a "substantial probability" he would harm himself, as evidenced by recent threats of suicide.  Steve acknowledges that saying goodbye and making statements about the gun belt and wanting to be "out of this world" could be interpreted as

references to suicide or self-harm. Still, Steve argues that the County failed to meet the statutory requirement of proving that it was much more likely than not that he would actually harm himself.

¶29 Steve points to Carol's testimony at the final hearing and he argues "it was clear in her testimony that Steve posed no danger to himself, to her or to anyone else." Although Carol testified at the final hearing that *she* was not afraid of Steve and that he had never expressed an intent to harm her, she was not asked and did not testify as to whether she believed Steve posed a danger to himself—the focus of his commitment. She did, however, note that at one point, she removed all of the guns from the home and barricaded herself in her bedroom due to Steve's behavior. As previously mentioned, Dr. Bales recounted that during their phone conversation, Carol explicitly recounted Steve making "very suicidal threats in the garage" on the day that she called 911. Based on these facts, we disagree with Steve's contention that Carol made it clear that he posed no harm to himself, and Bales' report supports the opposite conclusion.

¶30 Next, Steve argues that when he returned home and was met by police, he did not use or threaten violence against them. This outcome, he reasons, shows that there was not a "substantial probability" that the gun belt threat he made would lead to physical harm to himself. While we certainly take the result of a threat into consideration, whether a person explicitly follows through on a threat does not necessarily change the outcome of our dangerousness analysis. Given the circumstances, including Steve's many suicidal threats and his degenerating behaviors, the fact that Steve did not follow through with a threat on one occasion does not alter our conclusion that he was dangerous in that he was substantially likely to harm himself.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.