COURT OF APPEALS
DECISION
DATED AND FILED

April 7, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.       **2021AP2026**

Cir. Ct. No.  2003ME22

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN THE MATTER OF THE CONDITION OF H. I. B.:

WAUPACA COUNTY,

   PETITIONER-RESPONDENT,

 V.

H. I. B.,

   RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Waupaca County: VICKI L. CLUSSMAN, Judge. *Affirmed.*

¶1     BLANCHARD, P.J.[1] "Hazel" appeals a circuit court order extending her involuntary mental commitment.[2]  The order is based on jury findings that Hazel was mentally ill, a proper subject for treatment, and a danger to herself or others.  Hazel argues that Waupaca County did not meet its burden to prove by clear and convincing evidence at trial that, without continued commitment, she would become a danger to herself or others.  More specifically, she contends that the County failed to prove its theory that, if Hazel's treatment were withdrawn, she would be unable to satisfy her basic needs for nourishment, medical care, shelter, or safety, causing a substantial probability of imminent death or harm.  *See* WIS. STAT. §§ 51.20(1)(am), 51.20(1)(a)2.d.  I conclude that there was evidence presented at trial that gives rise to at least one reasonable set of inferences that supports the jury's challenged findings under the pertinent statutes.  Accordingly, I affirm both the recommitment order and the medication order.

## BACKGROUND

¶2     In May 2021, the County petitioned for a one-year extension of a prior Chapter 51 mental commitment of Hazel.  The County alleged that Hazel had a diagnosis of bipolar disorder, and that she

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] H.I.B.'s first name is not Hazel, but for ease of reading and consistent with the use of a pseudonym in this litigation to protect her privacy, I follow the County in referring to her as "Hazel."

Separately, Hazel also appeals a separate order requiring involuntary medication and treatment ("the medication order"), but she does not offer any separate argument on this issue. She merely asserts that, because the recommitment order is invalid, then the medication order must also be invalid.  I affirm the medication order based on my rejection of her challenge to the recommitment order.

has a history of significant physical and mental health decline when not in treatment. She receives necessary services 7 days per week, at least twice per day. Without services, [she] is at high risk of decompensation and hospitalization due to medication non-compliance, which results in increased paranoia, delusions, hallucinations, and food and water restricting.

¶3 The circuit court promptly issued an order appointing psychiatrist Marshall Bales to conduct an examination of Hazel in anticipation of a hearing on the recommitment petition.

¶4 Hazel requested a jury trial. At a trial, during which Hazel was represented by counsel, the jury heard testimony from two witnesses called by the County: Dr. Bales and Cary Ogden, the social worker who signed the petition to extend the commitment. Hazel called one witnesses, Renee Mykisen, a mental health technician who had worked with Hazel for 20 years. In addition, Hazel herself testified. Details of testimony are referenced in the Discussion section below.

¶5 The pertinent legal standards are summarized below. After the circuit court explained those standards to the jury, the jury found that Hazel was mentally ill, a proper subject for treatment, a danger to herself or others. As a result of these findings, the court entered the order for involuntary recommitment. Hazel appeals, with assistance from counsel.

## DISCUSSION

¶6 Hazel does not dispute that the County proved in this recommitment proceeding that she was mentally ill and a proper subject for treatment. Her exclusive argument is that the County failed to present clear and convincing evidence that she was dangerous under the terms of WIS. STAT. § 51.20(1)(a)2.d.

3

Applying the required standard of review that is deferential to the jury verdict, I conclude that there was sufficient evidence presented at trial that could create a reasonable inference that, if not committed, Hazel was at substantial risk of mental decompensation that would result in a lack of nourishment and hydration so significant that it presented a danger of serious physical harm. I now summarize the pertinent legal standards, provide additional background, and explain my conclusion.

### I. Legal Standards

¶7 Hazel does not contend that the circuit court improperly instructed the jury. The court accurately instructed that the County had the burden of proving three allegations "by clear, satisfactory, and convincing evidence," which was "convincing to a reasonable certainty": (1) Hazel was "mentally ill"; (2) her mental illness was "subject to treatment"; and (3) she was "dangerous to herself or another person." *See* WIS. STAT. § 51.20(1)(a)2.a.-e., (13)(e), (13)(g)1., (13)(g)3.; *Langlade County v. D.J.W.*, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277 ("To prevail in a recommitment proceeding, the County must prove the same elements necessary for the initial commitment by clear and convincing evidence—that the patient is (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others.").

¶8 The circuit court further explained to the jury in pertinent part that, in a recommitment proceeding such as this one, the evidence would satisfy the dangerousness standard with proof of "a substantial likelihood, based on [Hazel's] treatment records, that [she] would be a proper subject for commitment if treatment were withdrawn." *See* WIS. STAT. § 51.20(1)(am). Thus, as Hazel acknowledges in her appellate briefing, under § 51.20(1)(am), the County could

show current dangerousness without providing evidence of a recent overt act or omission that itself demonstrates dangerousness, but instead through evidence that one of five standards of dangerousness found in § 51.20(1)(a)2.a.-e. would recur if treatment were withdrawn. *See D.J.W.*, 391 Wis. 2d 231, ¶¶32, 41.

¶9 Applying these standards here, the circuit court further explained to the jury:

> The county alleges that there is a substantial likelihood that [Hazel] would become a proper subject for commitment and would be dangerous to herself or others if treatment were withdrawn.
>
> A person is dangerous to herself or others if she: Evidences behavior manifested by recent acts or omissions that, due to mental illness, she is unable to satisfy basic needs for nourishment, medical care, shelter, or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless she receives prompt and adequate treatment for this mental illness. No substantial probability of harm exists if reasonable provisions for her treatment and protection is available in the community and there is a reasonable probability that she will avail herself of these services.

*See* WIS. STAT. § 51.20(1)(a)2.d.

¶10 Turning to the standard of review, a reviewing court addressing a challenge to the sufficiency of evidence to support a jury verdict must sustain the verdict unless it concludes that there is no credible evidence to support the verdict. *Outagamie County v. Michael H.*, 2014 WI 127, ¶21, 359 Wis. 2d 272, 856 N.W.2d 603. The evidence is reviewed in the "light most favorable to the verdict." *Id.* The challenge to the sufficiency of evidence presents an issue of law. *Id.*

## II. Additional Background

¶11    Social worker Ogden testified in part as follows. During pertinent times, Ogden has worked in a direct-services program for persons with mental illnesses, such as providing home visits that are used in part to see that they take medications. Ogden has known Hazel in a professional capacity since 1989, began "formal interaction" with her in 1997, and became her primary case manager in May 2021.[3] Ogden was also familiar with her history, in part by conferring with other county employees regarding Hazel.

¶12    Ogden further testified that Hazel had been doing relatively well under commitment for the prior three years, which was "absolutely due to the complete treatment" she had been receiving. She had not exhibited any threatening behavior and did not appear to pose a threat to herself. She had been able to cook and clean and take care of herself.

¶13    Ogden further testified that, in collecting information in anticipation of signing a petition for recommitment, he interviewed Hazel in June 2021. Hazel told him that she was willing to allow direct services to continue, but also said that she planned to stop taking two medications prescribed by her psychiatrist: one for her mood and for her bipolar disorder. In the past, when Hazel has stopped taking her medications she started acting "unlike" herself, by drinking alcohol and acting

---

[3] The parties do not cite, and I cannot readily find in the record of the trial, evidence reflecting Hazel's age. The record does not reflect that any report containing Hazel's age was offered as an exhibit at trial. Counsel for Hazel asserted in opening statement, and again in closing argument, that she was 74 at the time of trial. Statements by attorneys are not evidence. However, the jury had an opportunity to see Hazel and to hear her testify, including her testimony that she had resided in the same house for more than 50 years and that she had a grandchild. I will assume for purposes of analysis that the jury could have reasonably found, based on all of the evidence, that she was in her 70s.

in a "paranoid" manner, including "barricad[ing] herself in her home" and "threatening" others in the community. In 2017 or 2018, "due to discontinuing [her] medications," Hazel's "condition deteriorated to the point [that] it affected her health," and required "inpatient" status to "stabiliz[e]" her sufficiently before she could return home. However, this was the last time such an incident occurred. Ogden further testified that, to his knowledge, Hazel has never demonstrated any insight into the fact that she is mentally ill.

¶14 Dr. Bales testified in part as follows. He met with Hazel one time, in June 2021, which was to evaluate her for purposes of this recommitment proceeding, which is one of "thousands" of cases in which he has played a similar role. He also reviewed Hazel's "voluminous" treatment records and "briefly" spoke with her treating psychiatrist. She has a diagnosis of schizoaffective disorder, with disorders in thought, mood, and perception. During the interview, she was "acutely symptomatic."[4] More specifically, she was "really manic," although "not severely manic," and expressed "paranoid, delusional thoughts." She was "disorganize[ed] in her thought patterns," although this was "non-severe" and "mild." She was "somewhat irritable, labile, and unstable."[5] While is possible that she may also suffer effects from a traumatic brain injury, which is a topic that Hazel raised with him, that would be separate from the effects of her

---

[4] Dr. Bales testified that he believed that Hazel manifested symptoms during the interview because she had "convinced [her] current psychiatrist to lower her antipsychotics," and suggested the view that she would not have manifested symptoms if she were being treated with prior, proper levels of medication.

[5] "Labile" means "readily or continually undergoing ... change or breakdown." *Labile*, Merriam-Webster.com., https://www.merriam-webster.com/dictionary/labile (last visited March 30, 2022).

"substantial mental illness." Dr. Bales testified that he lacked any basis to think that Hazel suffered from "neurological" damage or from dementia.

¶15 Dr. Bales further testified that if Hazel were no longer receiving treatment and medications her disorders of thought, mood, and perception would become worse. This would "severe[ly]" impair her judgment, behavior, capability to recognize reality, and her ability to meet the ordinary demands of life. Her treatment record reflects that, "many times over decades of time," "plain and simple, she gets dangerous without the very careful structure provided by the Waupaca County" Department of Health & Human Services. "[M]ost imminently she would become dangerous" because she would lack "the ability to care for herself."

¶16 Dr. Bales further testified that Hazel "irrational[ly] and unreasonabl[y]" "believes that she's not really ill, and that this is all from nerve damage, or it's a conspiracy by her children to keep her under their thumb and keep control of her," even though "the records indicate [that] she has extremely supportive children in reality, who have no interest in subjugating her." "In her mind, psychiatric medication was bogus, almost." Based on her denial of mental illness, Hazel said that she wanted to drop all of her mental health care, including psychiatric care, case management, and twice per day medication monitoring, "which is required because she won't take the medicine on her own."[6] "I could not logically talk to her about this. She became disorganized, angry, and there was

---

[6] I observe that the testimony of Ogden and Dr. Bales diverged on the issue of whether Hazel's position was that she wanted to drop all services provided by the County. But the jury could have reasonably credited Dr. Bales's testimony that she expressed to him that she wanted to drop "everything," which Dr. Bales testified "alarmed" him.

paranoia," including unfounded fears of County workers providing services to her. Hazel is not capable of expressing and understanding the advantages and disadvantages of accepting treatment because she denies any mental illness.

¶17 Dr. Bales acknowledged in his testimony that Hazel had not demonstrated "dangerousness that I can see, nor hospitalizations, nor police contacts … over the last year," although he expressed the opinion that this was in part due to "extremely careful supervision" that involves "intensive wraparound services." "There are reports that she actually maintains a nice household." He also testified that he did not at any point fear for his own safety in interviewing her. However, based on her history, if not treated, Dr. Bales was concerned about her ability to satisfy her basic needs for nutrition, medical care, shelter, and safety. He expressed the opinion that, in order for her to no longer require commitment, Hazel would "need[] to have a lengthy period of time where she's increasingly independent of … medication monitoring people, that she can be converted, say, from injectable antipsychotics to ensure compliance. A number of things need to happen before she can be voluntary."

¶18 Mykisen testified in part as follows. As a mental health technician, she had worked with Hazel for 20 years, which involved such tasks as taking her grocery shopping, to medical appointments, and other outings. Hazel does her own house cleaning and upkeep, including buying groceries and doing yard work. Mykisen testified that it is "perfect that [Hazel] has an eye on her," meaning someone to watch her, "in the morning and at night for her medication monitoring, I think that's very important." In around 2018, there was an issue with Hazel "not taking her medication" and "doing a lot of yard work, not hydrating, not taking a break" or "making sure she gets sufficient meals and food and hydration." "When she's out there working," she will forget to eat and drink enough fluids. As a

result in 2018 she was hospitalized, was placed in a group home for mentally ill people, and "got very, very sick." In addition, on "multiple" other occasions over the 20 years, Hazel did not take her medication, resulting in crises in which she needed to be placed in a setting other than her home. At times Hazel will deny that she is mentally ill.

¶19 Hazel testified in part as follows. She does not have a mental illness. Instead, "I just have a cranial nerve damage called the trigeminal nerve." For more than 50 years she has lived in the same house, which she owns. At the time of the trial, she resided with a son and a grandson. She takes care of the house and the yard, which is about an acre. She recently attended a granddaughter's wedding in Alabama. She takes her medications on a schedule, with monitoring by the County, and she has requested the monitoring because otherwise she will forget to take her medications. If a neurologist told her to take her medications, she would take them. She would be open to voluntarily receiving services from the County to help her take her medications, even if this were not required by court order. She did not tell Dr. Bales that she did not want to have in-home services anymore. Regarding the 2018 incident, she "had not missed my medication for any length of time" and she was not dehydrated. Also regarding that incident, "I lost some weight, and [a social worker] thought I looked a little pale." "I don't think I forget to eat."

### III. Analysis

¶20 Hazel argues that the trial evidence showed merely that she has a history of mental illness, which has included hospitalizations necessary to stabilize her. This evidence, she argues, was not sufficient to show, at a level of clear and convincing proof, "a substantial likelihood" that, if not committed, she would be,

due to mental illness, "unable to satisfy basic needs for nourishment, medical care, shelter, or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue." *See* WIS. STAT. § 51.20(1)(a)2.d. To the contrary, she contends, the evidence shows that "reasonable provisions for her treatment and protection [were] available in the community" and that "there [was] a reasonable probability that she [would] avail herself of these services." *See id.* In particular, she points to evidence of the lack of recent concerning incidents and argues that the jury was not "presented with specific and articulable facts from which the legal conclusion of dangerousness may be drawn."

¶21 The County argues that the evidence did meet the standards under WIS. STAT. § 51.20(1)(a)2.d. It emphasizes evidence that Hazel is a danger to herself partly because she "lacks insight into her own mental illness."

¶22 This may present a close case, even under the deferential standard of review. Much of the testimony elicited by the County was only suggestive and lacked detail such as dates and clear descriptions of conduct. The most specific testimony involved one three-year-old incident and there was unrebutted testimony that she had been doing relatively well under commitment during the intervening three years. Hazel explains well the reasons that the jury could have reached a different finding than it did on the dangerousness element. She notes that the specific evidence of a risk that "death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue" was not strong, and that this can be an important defect in a case such as this one because the mere existence of mental illness and a risk of decompensation are not enough. *See D.J.W.*, 391 Wis. 2d 231, ¶53 ("Inability to care for oneself does not equate

with a 'substantial probability' that 'death, serious physical injury, serious physical debilitation, or serious physical disease' would ensue if treatment were withdrawn.").

¶23 But I cannot conclude that there is no credible evidence to support the verdict when all of the evidence is viewed in the light most favorable to the verdict. *See Michael H.*, 359 Wis. 2d 272, ¶21. I agree with the County that there was sufficient evidence from which the jury could reasonably infer that there was a substantial likelihood that a lack of treatment would lead to a deterioration in Hazel's mental health and that this presented an imminent risk of grave self-care-related harms. The following five, related points, when considered together, constitute credible evidence that clears the low bar set by the sufficiency-of-evidence standard.

¶24 First, Dr. Bales testified that Hazel made clear to him that she was determined not to take her medications. Further, there are the aspects of Dr. Bales's testimony from which it could be reasonably inferred that she conveyed to him that she suspected that anyone who urged her to take the medications meant to do her harm. Dr. Bales testified that this firm determination by Hazel not to take the medications was significant. This was because, if she were no longer receiving medications, then her judgment, behavior, and capability to recognize reality, including her ability to meet the ordinary demands of life, would be "severe[ly]" impaired. She would "would become dangerous" imminently because she would lack "the ability to care for herself."

¶25 Hazel notes that it is not sufficient to satisfy the commitment elements for an expert to merely parrot legal standards in conclusory terms and she contends that Dr. Bales did so here. *See Winnebago County v. S.H.*, 2020 WI

12

App 46, ¶17, 393 Wis. 2d 511, 947 N.W.2d 761 ("reliance on assumptions concerning a recommitment at some unidentified point in the past, and conclusory opinions parroting the statutory language without actually discussing dangerousness, are insufficient to prove dangerousness in an extension hearing."). However, while his testimony lacked detail in some respects, Dr. Bales did not merely parrot the legal standards in conclusory terms. Instead, he conveyed his conclusions as medical opinions based on allegations of fact that he represented related specifically to Hazel and her circumstances.

¶26 Second, while not detailed, Ogden's testimony could be reasonably interpreted to suggest a pattern of occasions in the past when Hazel had not taken her medications and that on these occasions she would, on at least some occasions, "not allow people in her home," and at least once "barricaded herself in her home."

¶27 Third, Mykisen testified that "a couple times," most recently in 2018, Hazel had issues with eating and drinking enough and forgetting to take medications. "She doesn't know when to stop [working] sometimes." In the 2018 incident, it caused her to be hospitalized and become "very, very sick." While the jury could have given this testimony various interpretations, one reasonable interpretation of "very, very sick" would mean facing a risk of death, serious physical injury, or serious physical debilitation.

¶28 Fourth, the trial occurred when Hazel was three years older than she had been in 2018. A jury could reasonably infer, as a biological reality, that such risks from lack of food and water only increase with age for any human being already in her 70s.

¶29 Fifth, Hazel's own trial testimony could be reasonably interpreted to confirm what Dr. Bales testified she told him: she would not be taking the medications if she were not recommitted. In addition, if the testimony of other witnesses was credited, Hazel's own testimony severely downplayed the significance of the alleged 2018 incident. If viewed this way, it could have raised the reasonable inference that she either did not comprehend or did not care that failing to take her medications could result in her being "very, very sick" as a result of malnutrition and dehydration. This lack of comprehension or concern, if found by the jury, could significantly increase the reasonable assessment of risk.

¶30 Hazel places great weight on an attempt to equate this case with the facts in *D.J.W.*, in which our supreme court rejected as evidence for dangerousness that the person, if untreated, would be unable to maintain a job or had to rely on family support due to his mental illness. *See D.J.W.*, 391 Wis. 2d 231, ¶¶51-55. In contrast here, as summarized above, there was evidence from which the jury could reasonably find that there was a much more concrete risk of danger, up to and including imminent death, than was offered in *D.J.W.*

## CONCLUSION

¶31 For all of these reasons, I affirm the recommitment order and the medication order.

*By the Court*.—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

14