**COURT OF APPEALS
DECISION
DATED AND FILED**

**December 12, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP924**

**STATE OF WISCONSIN**

Cir. Ct. No. **2023ME66**

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF M.C.:

MONROE COUNTY DEPARTMENT OF HUMAN SERVICES,

   PETITIONER-RESPONDENT,

 V.

M.C.,

   RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Monroe County: MARK L. GOODMAN, Judge. *Reversed and cause remanded with directions*.

¶1     BLANCHARD, J.[1]  M.C. appeals an order of the circuit court involuntarily committing her under WIS. STAT. ch. 51.  She also appeals an order

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

for involuntary medication and treatment, although this aspect of the appeal is based solely on her arguments challenging the order for commitment. *See* WIS. STAT. §§ 51.20(13)(dm), 51.61(1)(g). M.C. argues that there was insufficient evidence to support the court's finding that M.C. was dangerous to herself or others as required for the commitment order. I conclude that the circuit court did not make sufficiently specific findings to support the conclusion that M.C. was dangerous under § 51.20(1). Accordingly, I reverse with directions to vacate the orders challenged in this appeal.[2]

## BACKGROUND

¶2 M.C. was detained pursuant to a statement of emergency detention that was completed by a police officer on October 26, 2023. *See* WIS. STAT. § 51.15 (addressing standards and procedures for emergency detentions). The circuit court held a probable cause hearing on October 31. *See* WIS. STAT. § 51.20(7) (defining probable-cause hearings for involuntary commitment for treatment proceedings). The Monroe County Department of Health and Human Services pursued M.C.'s commitment through all relevant proceedings. The court made determinations that included the following: that there was probable cause to

---

[2] The respondent's brief does not comply with WIS. STAT. RULE 809.19(8)(bm), which addresses the pagination of appellate briefs. *See* RULE 809.19(8)(bm) (providing that, when paginating briefs, parties should use "Arabic numerals with sequential numbering starting at '1' on the cover"). This rule was amended in 2021, *see* S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021), because briefs are now electronically filed in PDF format and electronically stamped with page numbers when they are accepted for e-filing. As our supreme court explained when it amended the rule, the pagination requirement ensures that the numbers on each page of the brief "will match … the page header applied by the eFiling system, avoiding the confusion of having two different page numbers" on every page of a brief. *See* RULE 809.19(8)(bm), cmt, 2021.

believe that M.C. was mentally ill, that she was a proper subject for treatment, and that she was dangerous to herself or others.

¶3 The circuit court appointed two examiners to evaluate M.C., Dr. Leslie Taylor and Dr. Michael Lace. *See* WIS. STAT. § 51.20(9) (describing process for examinations in commitment proceedings). Each examiner filed a report with the court.

¶4 A "final hearing" was held on November 9, 2024, to allow the circuit court to determine whether to issue an order committing M.C. *See* WIS. STAT. § 51.20(10) (describing procedures for final hearings in commitment proceedings). The County called the two examiners as witnesses, and M.C. also testified.

¶5 The circuit court determined that M.C. was dangerous for purposes of ordering a commitment under WIS. STAT. § 51.20 based on two separate "standards of dangerousness." *See **Winnebago County v. S.H.**,* 2020 WI App 46, ¶8, 393 Wis. 2d 511, 947 N.W.2d 761 (citing § 51.20(1)(a)2.a.-e.; ***Portage County v. J.W.K.***, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509). Specifically, the court determined that M.C. met the requirements of the "first" and "third" standards of dangerousness. Addressing the "first standard," the court found that there was a "substantial probability" that M.C. would harm herself. *See* § 51.20(1)(a)2.a. Addressing the "third standard," the court found that there was a "substantial probability" of "physical impairment or injury" to M.C. or others "due to [M.C. having] impaired judgment." *See* § 51.20(1)(a)2.c. Based on these and

3

other findings, the court ordered that M.C. be committed for six months in a locked facility.[3] M.C. appeals.

## DISCUSSION

¶6 The County bore the burden to prove M.C.'s dangerousness under WIS. STAT. § 51.20(1)(a) by clear and convincing evidence. *See J.W.K.*, 386 Wis. 2d 672, ¶17 (citing § 51.20(13)(e)). Each standard of dangerousness requires the County "to identify recent acts or omissions demonstrating that the individual is a danger to himself [or herself] or to others." *Id.*; *see also* § 51.20(1)(a)1. I address below the specific recent-acts requirements for the "first standard" and the "third standard."

¶7 "Substantial probability" in this context means "'much more likely than not.'" *Marathon County v. D.K.*, 2020 WI 8, ¶35, 390 Wis. 2d 50, 937 N.W.2d 901 (quoted source omitted). Showing a substantial probability does not require proof rising to the level of certainty, but "mere possibility and conjecture are insufficient." *See id.*, ¶52.

¶8 This court upholds circuit court's findings of fact that are not shown to be clearly erroneous. *See Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. Whether the facts satisfy the statutory standard is a question of law this court reviews de novo. *See id.* That is, determining "dangerousness is not a factual determination, but a legal one based on underlying

---

[3] M.C.'s commitment has expired. But this appeal is not moot. *See Marathon County v. D.K.*, 2020 WI 8, ¶25, 390 Wis. 2d 50, 937 N.W.2d 901.

facts." ***Langlade County v. D.J.W.***, 2020 WI 41, ¶47, 391 Wis. 2d 231, 942 N.W.2d 277.

¶9      Circuit courts are required "to make specific factual findings with reference to" the dangerousness standard or standards that the court relies on in determining that an individual is dangerous for purposes of WIS. STAT. § 51.20(1)(a).  *See **D.J.W.***, 391 Wis. 2d 231, ¶¶40, 42-44; *see also **Trempealeau County v. C.B.O.***, Nos. 2021AP1955, 2022AP102, unpublished slip op. ¶28 (WI App Aug. 30, 2022) (applying the ***D.J.W.*** requirement to initial commitments; gathering unpublished one-judge decisions doing the same).[4]  Merely citing a listed standard of dangerousness and reciting what is required to meet that standard does not meet this requirement.  Instead, under ***D.J.W.***, in order to meet the substantial probability threshold, the court must make "specific factual findings" supporting a conclusion that one of the listed standards has been met. *See **Waupaca County v. J.D.C.***, No. 2023AP961, unpublished slip op. ¶¶14-15 (WI App Sept. 14, 2023) (quoting ***Sheboygan County v. M.W.***, 2022 WI 40, ¶¶41-42, 402 Wis. 2d 1, 974 N.W.2d 733 (Hagedorn, J., concurring)).

**I.  Additional Background**

¶10     Both examiners based their reports and testimony on their direct, personal assessments of M.C. after her emergency detention, in addition to the examiners' reviews of such collateral sources as historical reports regarding M.C.'s mental and physical health.  Both testified that M.C. was mentally ill,

---

[4] Unpublished opinions authored by a single judge, issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

describing her as manic and suffering from delusions, and this is not disputed on appeal.

¶11 Dr. Lace testified in pertinent part to the following. M.C. was "manic" when they met. On the topic of what led to M.C.'s emergency detention, M.C. reported that she had "accidentally" ingested medication that her son was taking to treat his bipolar disorder. M.C. also reported that she was not having suicidal thoughts or delusions. At the same time, however, M.C. "talked about some passive suicidal thinking," along the lines of, "if [she were to die], that would be okay with her[,] but she wasn't … going to actively pursue" suicide. Dr. Lace did not "have a huge concern" about M.C.'s "passive suicidal thoughts," and answered "No" when asked if M.C. had made "any threat of suicide." Yet, he did check a box in his report for dangerousness under the "first standard." He checked this box because he deemed it "certainly possible" that M.C. could harm herself.

¶12 Expanding on this point, Dr. Lace characterized M.C.'s "thinking" as "unusual," in that at the times when she was manic and "presented with active delusions, she could be misinterpreted by other people or she could misinterpret their intentions and put herself in a dangerous situation." However, Dr. Lace did not explain further what he meant by these references. For example, he did not provide illustrations of potential misinterpretations of M.C. by other people or of other people by M.C., nor examples of particular "dangerous situations." More generally, Dr. Lace did not define what he meant by "passive suicidal thoughts" beyond his brief description of M.C.'s statements about "be[ing] okay" with dying.

¶13    Dr. Lace further testified that he was concerned with M.C.'s "ability to provide for her own care" due to her "level of delusions." More specifically, Dr. Lace "could see her perhaps maybe skipping meals or forgetting to do certain things while she was in a manic state, certainly."

¶14    Dr. Taylor testified in pertinent part to the following. M.C. told Dr. Taylor that M.C. had intentionally taken medication that had been prescribed for her son to treat a bipolar disorder. Dr. Taylor stated that, if the medication were "taken in a large dose," it "may cause harm," although Dr. Taylor did not testify how much of the medication M.C. allegedly took. M.C. insisted to various doctors during her detention that she be allowed to take a particular kind of antidepressant medication, but this kind of medication can make worse the kind of mania that M.C. struggled with. Even after this potential harm was explained to M.C. multiple times, "she just essentially refuses to believe it." M.C. posted on Facebook that, as Dr. Taylor put it in her testimony, M.C. "didn't want to live anymore because … she was feeling threatened" by other people.[5] M.C.'s reasons for feeling this way were difficult for Dr. Taylor to understand, given statements M.C. made that reflected delusional thinking, but M.C.'s feelings had something to do with allegations of past sexual assaults and a conspiracy by others to commit additional assaults.[6]

---

[5] The contents of the Facebook post were not introduced at the hearing and the circuit court made no reference to the post. At the hearing, Dr. Taylor testified that she did not recall if she had seen the Facebook post itself, but stated that her understanding was that it stated that M.C. "wanted to die and that she wanted someone else to do it for her."

[6] Dr. Taylor's report gave what appeared to be quotations of M.C.'s statements reflecting delusional thinking. The circuit court could have properly relied on the examiners' reports despite the fact that those reports were not admitted into evidence. *See* ***Outagamie County v. L. X. D.-O.***, 2023 WI App 17, ¶34, 407 Wis. 2d 441, 991 N.W.2d 518, *review denied* (WI May 24, 2023) (No. 2020AP1806). However, the circuit court did not make any specific findings

(continued)

¶15    Dr. Taylor testified that M.C.'s taking of her son's pills and posting about the end of her life on Facebook demonstrated a substantial probability that M.C. would harm herself.  Although Dr. Taylor gave this opinion in reference to both "the first and third standard[s]" of dangerousness, her explanation for her opinion did not explicitly address the risk of intentional self-harm.  Rather, Dr. Taylor testified that M.C.'s "delusional thinking and her mania were substantial enough to lead to sort of an inability to manage her needs and be able to manage her … children['s] needs."

¶16    M.C. testified that her Facebook post was not a threat of suicide, but instead was "a comment that was very immature to make."  More generally, M.C. testified that she had not made recent threats of, nor made plans for, a suicide attempt.  M.C. further testified that, when she went to the hospital, she "thought" that she had taken her son's medication, but she in fact had not; she testified that "[i]t was found later … that [the medication] was not in my system."[7]

¶17    The circuit court partially summarized the testimony of Dr. Lace and Dr. Taylor, appearing to credit these witnesses regarding the facts that the court summarized.  In particular, the court appeared to rely on the summarized evidence for the determination that M.C. was mentally ill.

¶18    Moving to the determination of dangerousness, the circuit court said that there was a substantial probability that M.C. would physically harm herself

---

regarding any factual detail included in the reports that was not addressed in the examiners' testimony.

[7] On cross examination, Dr. Taylor stated that she believed that a test of M.C.'s blood was performed when she presented herself at the hospital, but that Dr. Taylor could not recall what the results of any testing might have been.

and a substantial probability that she could physically harm others through impaired judgment. The court then said, "For example, she … allegedly took her son's medication and … she has five children." The court reasoned that such behavior "certainly could endanger the kids if she's in a very manic state."

## II. "First Standard"

¶19 Under the "first standard," the County bore the burden of demonstrating that M.C. had made a recent threat or attempt at suicide or serious bodily harm to herself. *See* WIS. STAT. § 51.20(1)(a)2.a. ("Evidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm."). The County does not identify any evidence before the circuit court suggesting that M.C. made a "recent … attempt[] at suicide or serious bodily harm" to herself. *See* § 51.20(1)(a)2.a. Thus, the issue here involved proof of recent threats, not of actual attempts, of suicide or serious bodily harm. That is, in order to meet the "first standard" of dangerousness, the County had to prove, and the specific findings of the court needed to support, the determination that there was "a substantial probability" that M.C. would attempt to end her own life or seriously harm herself, as "manifested" through recent threats of suicide or serious bodily harm. *See* § 51.20(1)(a)2.a.; **D.J.W.**, 391 Wis. 2d 231, ¶42. At the same time, however, an "articulated plan" to commit suicide "is not a necessary component" of the proof required under the "first standard" based on a threat of suicide. *See* **Outagamie County v. Michael H.**, 2014 WI 127, ¶6, 359 Wis. 2d 272, 856 N.W.2d 603.

¶20 In reference to the "first standard," the closest that the circuit court came to making a specific, relevant finding was to summarize Dr. Lace's

testimony that M.C. had what Dr. Lace described as "passive suicidal" thoughts. Assuming without deciding that the court's summary of this testimony was itself a specific finding with reference to the "first standard," I conclude that this finding alone is not sufficient to meet the standard. To repeat, Dr. Lace identified a Facebook post in which M.C. stated that, in Dr. Lace's words, it "would be okay with" M.C. if she died, but also that, in Dr. Lace's view, "she wasn't going to actively pursue" her own death. On this record, I cannot conclude that Dr. Lace's testimony provided clear and convincing evidence of a recent "threat" by M.C. to commit suicide or seriously bodily harm to herself.

¶21 Explaining my conclusion further, the circuit court did not explain why Dr. Lace should have interpreted what he characterized as M.C.'s mere "passive suicidal" thoughts as equating to a threat of suicide or seriously bodily harm to herself. As noted above, Dr. Lace used only vague and general terms in an apparent attempt to suggest a mechanism through which M.C.'s passive suicidal thinking could lead to harm to her—namely, that she could place herself in "dangerous situations," be misinterpreted by others, or misinterpret the intentions of others. This testimony did not include any examples or details, and the court did not make specific findings expanding on what the court might have interpreted Dr. Lace to mean. This cannot reasonably be interpreted as clear and convincing evidence of a recent threat of suicide or seriously bodily harm to herself, and therefore the County has not shown that it is much more likely than not that M.C. was dangerous to herself or others.

¶22 The County notes that the circuit court said that there was a substantial probability that M.C. would physically harm herself. But this was merely an assertion; it did not constitute a specific finding that M.C. had made a

10

recent threat of suicide. *See* ***D.J.W.***, 391 Wis. 2d 231, ¶¶40, 42-44; ***J.D.C.***, No. 2023AP961, ¶¶14-15.

¶23 Separately, the County observes that aspects of Dr. Taylor's report and testimony characterize M.C.'s Facebook post as M.C. expressing a desire to die, and further highlights M.C.'s report of having ingested some of her son's medication. The County asserts that this was sufficient evidence to support a determination of dangerousness. But the County does not develop an argument applying relevant legal authority to the evidence.

¶24 Further, even if I set to one side the lack of applied legal authority, the County's argument still fails because the circuit court's summary of the evidence did not mention Dr. Taylor's testimony regarding the Facebook post or discussion of that topic in her report. More generally, the court did not make any findings about the Facebook post itself or how it might reflect an expression of intent by M.C. to attempt suicide or serious bodily harm. Similarly, the court did not make an express finding that M.C. in fact ingested any of her son's medication for bipolar disorder or that, if she did, this would reasonably be interpreted as an attempt at, or some form of threat of, self-harm.[8]

### III. "Third Standard"

¶25 To support a commitment under the "third standard," the circuit court was required to make specific findings identifying "a pattern of recent acts or omissions" as manifestations of M.C. having an "impaired judgment" that

---

[8] The circuit court spoke only in terms of M.C. "allegedly" taking her son's medication, leaving the record ambiguous as to whether the court believed that it had a sufficient evidentiary basis to find that she had in fact done so.

created a substantial probability of physical impairment or injury to M.C. or to others. *See* WIS. STAT. § 51.20(1)(a)2.c.; ***D.J.W.***, 391 Wis. 2d 231, ¶40; ***C.B.O.***, Nos. 2021AP1955, 2022AP102, ¶28. Under the "third standard," "[t]he probability of physical impairment or injury is not substantial": "if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services"; or if "the individual may be provided protective placement or protective services under" WIS. STAT. ch. 55. *See* § 51.20(1)(a)2.c.

¶26 The circuit court's expressly stated reasoning more clearly addressed the "third standard" than the "first standard." The court emphasized its determination that M.C. could harm herself or others due to impaired judgment. The problem here, however, is that the court's findings regarding dangerousness did not identify a pattern of acts or omissions. Instead, the court provided a single "example" of M.C.'s impaired judgment—that she "allegedly took her son's medication."

¶27 Assuming without deciding that the circuit court implicitly found that M.C. actually ingested some of the medication prescribed to her son for a bipolar disorder, this could reasonably raise a reasonable inference of some degree of impaired judgment—based on the general principle that ingesting any amount of another person's prescribed medication is typically not advisable and can result in adverse reactions.[9] Further, it is true that the undisputed evidence was that

---

[9] One related, but weaker, possible inference might be that, whether or not M.C. actually ingested any of her son's medication, the fact that she initially reported having done so suggested thoughts of possible self-harm. But even if I were to assume the weaker inference involving M.C. merely talking about taking the son's medication it would not be sufficient proof for the reasons stated in the text.

12

M.C. was mentally ill, and the court could reasonably view as concerning the testimony regarding her delusions, as described in the examiners' reports and testimony.

¶28 Still, it remains that a single event does not constitute a pattern of acts or omissions, as required by WIS. STAT. § 51.20(1)(a)2.c. Moreover, the circuit court's discussion of the single instance of allegedly ingesting her son's medication was limited. The court made the generalized finding that M.C. "could" be a danger to her children when in a manic state, but it did not explain in what way or ways, based on what particular evidence. Without further specific findings of the circuit court to consider, this court could only speculate as to a way or ways in which the circuit court considered there to be credible evidence establishing M.C. to be a potential danger to herself or children as part of a pattern of acts. The case law does not permit such speculation.

¶29 Turning specifically to the testimony about delusions, the circuit court summarized some of this evidence, but without making specific findings regarding how it connected to a pattern of acts or omissions demonstrating impaired judgment. *See D.J.W.*, 391 Wis. 2d 231, ¶57 (if "[a] diagnosis of schizophrenia, by itself, … demonstrate[s] the requisite 'substantial probability of physical impairment' … the statutory elements of mental illness and dangerousness would be merely redundant"); *Michael H.*, 359 Wis. 2d 272, ¶39 (weighing "the pattern of [the committee's] paranoia and increasing distress" as relevant to the "third standard" and considering a series of acts under the standard).

¶30 Also absent from the record are any circuit court findings on the topic of whether reasonable provision for the safety of M.C. and her family could

be made in the community. *See* WIS. STAT. § 51.20(1)(a)2.c. Nor did the court mention whether protective placement or services under WIS. STAT. ch. 55 may be provided to M.C. *See* § 51.20(1)(a)2.c. As noted, the court determined that there was a substantial probability of harm under the "third standard," but this recitation of an ultimate conclusion required for commitment does not constitute a specific finding. *See **D.J.W.**,* 391 Wis. 2d 231, ¶¶40, 42-44; ***J.D.C.**,* No. 2023AP961, ¶¶14-15.

¶31 The County does not present any additional arguments on appeal regarding the "third standard" beyond those that I address and reject above in discussing the "first standard."

¶32 Turning to the issue of a remedy, M.C. requests that this court reverse the circuit court orders placing M.C. under an initial commitment and for involuntary medication and treatment, and that this court direct the circuit court to vacate those orders. *See **M.W.**,* 402 Wis. 2d 1, ¶4 (remedy for reversal of recommitment order based on insufficient findings of the circuit court is "outright reversal" when recommitment has expired); WIS. STAT. §§ 51.20(13)(dm), 51.61(1)(g) (order for involuntary medication or treatment requires order for commitment). The County does not address the topic of appropriate remedies, tacitly conceding that M.C.'s requested remedies are appropriate.

## CONCLUSION

¶33 For all these reasons, the orders of the circuit court placing M.C. under an initial commitment and for involuntary medication or treatment are reversed and the case is remanded for the court to vacate the orders.

*By the Court*.—Orders reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.