COURT OF APPEALS
DECISION
DATED AND FILED

**January 9, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2024AP2098-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. 2009GN71

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE GUARDIANSHIP OF P.J.L.:

WOOD COUNTY,

  PETITIONER-RESPONDENT,

 V.

P. J. L.,

  RESPONDENT-APPELLANT.

        APPEAL from an order of the circuit court for Wood County: TODD P. WOLF, Judge. *Affirmed.*

¶1 BLANCHARD, J.[1] P.J.L. appeals an order for his protective placement under WIS. STAT. § 55.08(1) following a jury trial. He argues that Wood County failed to prove by clear and convincing evidence the following "standards" for placement required by statute: that P.J.L. was incompetent at the time of trial; that P.J.L. has "a primary need for residential care and custody"; and that mental illness and other like incapacities rendered him so totally incapable of providing for his own care that it created a substantial risk of serious harm to himself or others. *See* WIS. STAT. §§ 55.075(3) (addressing petitions for protective services or placement), 55.08(1) (stating required standards). I conclude that, viewing the evidence presented at trial in a light most favorable to the verdict, there was sufficient evidence for the County to carry its burden of proving the necessity of continued protective placement and therefore supporting entry of the challenged order.

¶2 P.J.L. asserts in the alternative that, even though the placement continuation was supported by the jury's findings, the circuit court failed to make sufficient findings supporting the continuation of his placement before entering an order. I reject this alternative position because it is not presented in a developed argument. P.J.L. does not provide legally supported reasoning, applied to the circuit court's post-verdict actions, that could require reversal on that ground.

¶3 Accordingly, I affirm.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted. Neither side in this appeal suggests that any of the case law cited in this opinion must be construed in light of statutory changes that may have occurred since a cited opinion was issued, and I am not independently aware of any such statutory changes. Therefore, I do not note the prior versions of the statutes that were relied on in cited case law.

## BACKGROUND

¶4    P.J.L. was placed under a guardianship in 2009 after he attempted suicide, resulting in a brain injury.

¶5    He first became subject to a protective placement in 2021. This placement continued following several annual reviews resulting in circuit court extensions of the placement. *See* WIS. STAT. § 55.18 (outlining procedures for annual review of protective placement, which may call for the circuit court to "order the continuation of the protective placement"). The County petitioned for the continuation of P.J.L.'s placement most recently in November 2023, leading to the order that P.J.L. now challenges. Pursuant to WIS. STAT. § 55.10(4)(c), P.J.L. demanded a jury trial to address whether the County's petition should be granted.

¶6    The County called three witnesses to testify at trial: Dr. Nicholas Starr, who was appointed by the circuit court in these proceedings to evaluate P.J.L.; Sarah Dortch, a County case worker assigned to work with P.J.L.; and Ryan Schultz, another County employee, who facilitated and oversaw the provision of services to P.J.L. during his placement. P.J.L. called his sister, C.L., who is also P.J.L.'s guardian.

¶7    The jury returned verdicts in favor of continuing protective placement. The three specific jury findings supporting this result were that P.J.L. was incompetent, that he suffered from a disability that was "permanent or likely to be permanent," and that he was in need of protective placement. Based on the jury's verdicts and corresponding findings by the circuit court that he continued to meet the standards for protective placement, the court entered an order continuing placement. P.J.L. appeals.

## DISCUSSION

¶8 The parties agree that the following standards of review apply in this appeal. Whether the evidence is sufficient to support the jury's verdicts is a question of law this court reviews de novo. *See Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶17, 333 Wis. 2d 273, 797 N.W.2d 854; *Sheboygan Cnty. DHHS v. Tanya M.B.*, 2010 WI 55, ¶18, 325 Wis. 2d 524, 785 N.W.2d 369. When reviewing a challenge to the sufficiency of the evidence to support a jury verdict, this court "views evidence most favorably to sustaining a verdict." *See Outagamie County v. Michael H.*, 2014 WI 127, ¶21, 359 Wis. 2d 272, 856 N.W.2d 603 (citing *Tammy W-G.*, 333 Wis. 2d 273, ¶17).

¶9 Pertinent here, the circuit court may "order protective placement for an individual who meets all of" four "standards":

> "(a) The individual has a primary need for residential care and custody.
>
> (b) The individual is ... an adult who has been determined to be incompetent by a circuit court.
>
> (c) As a result of developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others ....
>
> (d) The individual has a disability that is permanent or likely to be permanent."

*See Jackson Cnty. DHHS v. Susan H.*, 2010 WI App 82, ¶3, 326 Wis. 2d 246, 785 N.W.2d 677 (quoting WIS. STAT. § 55.08(1)).[2]

¶10    As noted above, P.J.L.'s sufficiency argument challenges whether the County met its burden of proof regarding the following:  that P.J.L. was incompetent at the time of trial, which he argues is required to meet WIS. STAT. § 55.08(1)(b); that he had "a primary need for residential care and custody" as required under § 55.08(1)(a); and that mental illness and other like incapacities rendered him so totally incapable of providing for his own care that it created a substantial risk of serious harm to himself or others as required under § 55.08(1)(c).

### I. Incompetency

¶11    As an initial matter, the parties dispute what the County was required to prove at trial regarding P.J.L.'s competency.  P.J.L. argues that the County had to prove that he was, in the words of WIS. STAT. § 55.08(1)(b), "an adult who has been determined to be incompetent by a circuit court" *at the time of trial*.  The County argues that it merely had to prove that P.J.L. was "an adult who has been determined to be incompetent by a circuit court" *at any time leading up*

---

[2] I note that there is overlap between the required standards for ordering protective placement.  For example, both WIS. STAT. § 55.08(1)(a) and (c) reference "care" and "custody." *See Jackson Cnty. DHHS v. Susan H.*, 2010 WI App 82, ¶¶16-17, 326 Wis. 2d 246, 785 N.W.2d 677 (interpreting meaning of "care" and "custody" for purposes of both provisions).  Also overlapping with "care" and "custody" are statutory definitions of the conditions that meet the standard in § 55.08(1)(c). *See* WIS. STAT. § 55.01(6v) ("'Serious and persistent mental illness' means a mental illness that … causes a substantially diminished level of functioning in the primary aspects of daily living and an inability to cope with the ordinary demands of life …."), § 55.01(5) ("'Other like incapacities' means those conditions … which substantially impairs an individual from adequately providing for his or her care or custody.").  Accordingly, much of the trial testimony was relevant to more than one of the required standards.

*to or including the time of trial.* I assume without deciding, in P.J.L.'s favor, that the County was required to prove incompetence as of the time of trial.[3]

¶12 As an alternative argument on this issue, the County contends that there was sufficient evidence at trial to support a finding that P.J.L. was incompetent at the time of trial. After providing additional pertinent legal standards, I explain why I agree with this alternative argument, and I address P.J.L.'s arguments to the contrary.

¶13 Setting aside the County's argument that it did not need to prove incompetency at the time of trial, there is no dispute that the circuit court accurately instructed the jury regarding what was required as that proof that P.J.L. was incompetent at the time of trial. Specifically, the court instructed the jury that the following, which I sometimes refer to as "the elements of incompetence," had to be established by clear and convincing evidence:

> That [P.J.L.] is aged at least 17 years and 9 months and that [P.J.L.] suffers from persistent and [serious] mental illness or other like incapacity and that because of the impairment [P.J.L.] is unable to effectively receive or evaluate information or to make or communicate decisions to such an extent that he cannot meet the essential requirements of his physical health and safety.

---

[3] As P.J.L. notes on appeal, the circuit court's instructions to the jury required the jury to find that P.J.L. was incompetent at the time of trial in order to enter a verdict in the County's favor. *See* WIS JI—CIVIL 7060. Moreover, at least one statute outside WIS. STAT. § 55.08(1) strongly suggests, if it does not mandate, that incompetency be addressed with each annual review. *See* WIS. STAT. § 55.075 ("If the individual is adjudicated incompetent in this state more than 12 months before the filing of an application for protective placement … on his or her behalf, the court shall review the finding of incompetency."); *see also* **Sheboygan County v. Terry L. M.**, No. 2014AP2010, unpublished slip op. ¶¶8-9 (Apr. 1, 2015) ("squarely reject[ing]" county's argument that it did "not need to prove incompetency at a continuation review hearing" under § 55.08(1) and WIS. STAT. § 55.18).

> … [A]nd … [P.J.L.]'s need for assistance in decision-making or communication cannot be effectively [and ]less restrictively through appropriate and reasonable available training, education, support services, healthcare, assistive devices or other means that the individual will accept.

*See* WIS JI—CIVIL 7060; *see also* WIS. STAT. § 54.10(3)(a) (listing required findings for the appointment of a guardian of the person or of the estate, or both); WIS. STAT. § 55.075(3) (requiring that petition for guardianship "be heard prior to ordering protective placement" and that the circuit court review "the finding of incompetency" if a previous finding had been made more than 12 months before the application for protective services). There is also no dispute about the accuracy of the court's instructions to the jury regarding the statutory definitions for the phrases "met with the essential requirements for health and safety," "serious persistent mental illness," and "other like incapacity." *See* WIS. STAT. § 54.01(19), (22), (30); WIS. STAT. § 55.01(5), (6v).

¶14 Regarding P.J.L.'s age, he does not dispute that he was older than 17 years and 9 months at all pertinent times.

¶15 Turning to the next element of incompetence, P.J.L. acknowledges that Dr. Starr's testimony identified conditions that the County argued constituted a "serious and persistent mental illness" and "other like incapacity." Specifically, Dr. Starr testified that P.J.L. suffered from antisocial personality disorder, which Dr. Starr considered in P.J.L.'s case to be a serious and persistent mental illness. In addition, Dr. Starr testified that P.J.L.'s brain injury qualified as an "other like incapacity," and that P.J.L. further suffered from alcohol dependence to a degree that itself created "an incapacity." P.J.L. does not dispute that he in fact suffered from both antisocial personality disorder and the brain injury, nor does he directly challenge Dr. Starr's testimony as a basis to establish that these conditions meet

7

the respective statutory definitions for a "serious and persistent mental illness" and "other like incapacities." *See* WIS. STAT. § 55.01(6v) ("'Serious and persistent mental illness' includes schizophrenia as well as a wide spectrum of psychotic and other severely disabling psychiatric diagnostic categories, but does not include degenerative brain disorder or a primary diagnosis of a developmental disability or of alcohol or drug dependence," which are defined separately.). To the extent that P.J.L. indirectly challenges this aspect of Dr. Starr's testimony through other arguments regarding incompetence or the other required standards of protective placement, I address and reject those arguments below.

¶16 Regarding the trial evidence involving P.J.L.'s ability to receive and evaluation information, he acknowledges that it was "certainly concerning," but he contends that it did not amount to clear and convincing evidence. I conclude that Dr. Starr's testimony presented clear and convincing evidence that: P.J.L.'s incapacities prevented him from effectively receiving or evaluating information; that these incapacities prevented P.J.L. from effectively communicating decisions; and that the extent of P.J.L.'s evaluation and communication difficulties were such that he could not meet what one guardianship provision refers to as "the essential requirements for his or her physical health and safety." *See* WIS. STAT. § 54.10(3)(a)2.

¶17 Explaining this conclusion further, Dr. Starr testified that P.J.L.'s antisocial personality disorder and brain injury interfere with his ability to "receive and evaluate information." When asked to elaborate, Dr. Starr testified that these conditions, in addition to P.J.L.'s alcohol dependence, "impair" his "perception, [his] ability to relate to other people, [his] ability to control [his] behaviors, and [his ]ability to control [his] emotions." Dr. Starr further testified that P.J.L.'s incapacities interfered with his ability to: "communicate decisions"; "protect

8

himself from abuse, exploitation, neglect[,] or rights violations"; and "meet[] his essential requirements" for health and safety. Dr. Starr testified that the "[m]ost recent and clear example" of P.J.L.'s incapacities having these effects was that he "continued to use alcohol with his medications[,] which presented a significant medical danger" resulting in "the psychiatrist [having] to discontinue his medications." Regarding this last, County employee Schultz testified that P.J.L.'s psychiatrist expressed concern that "it could be lethal" for P.J.L. to take his medications in combination with alcohol. Schultz testified that when this was explained to P.J.L., his response was, "I guess we'll just see."

¶18 The jury was free to credit Dr. Starr's explanation that P.J.L.'s incapacities impaired his ability to relate with others. From this, the jury could reasonably infer that this prevented P.J.L.'s effective receipt and evaluation of information from others and that it also interfered with his ability to communicate his decisions to others. Further, the example of P.J.L. using alcohol while on his medications—and his expression on at least one occasion of a seemingly indifferent attitude about the potential lethality of his conduct—connected P.J.L.'s ability to receive and evaluate information to his ability to "perform those actions necessary to provide … health care" for himself. *See* WIS. STAT. §§ 54.01(19), 54.10(3)(a)2.

¶19 Turning to the next element of incompetence, P.J.L. argues that there was not clear and convincing evidence that P.J.L.'s "need for assistance in decision-making or communication cannot be met effectively and less restrictively" through services not involving a guardianship and protective placement. *See* WIS. STAT. § 54.10(3)(a)4. I reject this argument because the jury could reasonably credit Dr. Starr's related testimony. Dr. Starr opined that less restrictive measures would not be successful in assisting P.J.L., based on P.J.L.'s

history of receiving "services and placements over the years" that did not result in eliminating the need for a guardian. Dr. Starr also based this opinion on P.J.L. being "uncooperative" and having "a history of noncompliance."

¶20 It is true that Dr. Starr's specific testimony on this topic was not detailed. But viewed in light of the testimony of other witnesses, it sufficiently supports the jury's verdict on incompetence. For example, County employee Dortch testified that, while P.J.L. had recently been making some "better decisions as far as life choices" given the placement support, P.J.L. still needed prompting to perform certain tasks and had been "caught with alcohol within the last couple of months." Schultz gave similar testimony. Dortch supported continued placement to see if P.J.L. could "go for longer periods of time without any incident reports showing that he has more self-control as far as alcohol use or other behaviors." This raised the reasonable inference that whatever improvements P.J.L. had made in his ability to take care of himself were not likely to continue without the added oversight and support provided by protective placement compared with less restrictive measures.

¶21 P.J.L. emphasizes particular evidence introduced at trial that he asserts shows that his alcohol consumption was decreasing by the time of trial. Specifically, he notes that the guardian testified that P.J.L. understood that he had a problem with alcohol and had been undergoing treatment for alcohol dependence for about four months as of the time of trial. And, more generally, P.J.L. highlights the guardian's testimony that P.J.L. had shown improvement in certain areas of day-to-day care for himself, and that on that basis the guardian no longer believed that a guardianship and protective placement were necessary. However, the jury was free to weigh the guardian's testimony as less significant than testimony from others which tended to show that P.J.L.'s alcohol consumption

was still a serious problem even as he showed improvement in other areas. *See Geise v. American Transmission Co. LLC ex rel. ATC Mgmt. Inc.*, 2014 WI App 72, ¶13, 355 Wis. 2d 454, 853 N.W.2d 564 ("The jury, as the trier of fact, 'determines the credibility of the witnesses, resolves conflicts in the testimony, weighs the evidence and draws reasonable inferences from the evidence.'" (quoted source omitted)). For example, Schultz testified that the most recent episode of P.J.L. consuming alcohol was in April 2024, approximately one month before trial.

### II. Primary Need for Residential Care and Custody

¶22    In addition to proving incompetence, as noted above, the County had the burden to prove additional required standards set forth in WIS. STAT. § 55.08(1), which included that P.J.L. had a "primary need for residential care and custody." *See* § 55.08(1)(a). More specifically, the County had to prove that P.J.L. had "primary" needs to: (1) have his daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect. *See Susan H.*, 326 Wis. 2d 246, ¶16 (interpreting § 55.08(1)(a), in part in light of WIS. STAT. § 55.001).

¶23    I conclude that the following evidence was sufficient to sustain the jury's verdicts with respect to this required protective placement standard. Dr. Starr testified that P.J.L. had a primary need for residential care and custody. Dr. Starr took the position that residential care and custody were "essential" in order for "any other interventions" to be "successful" in protecting P.J.L. Further, as noted, Dortch's testimony was to the effect that the oversight provided by protective placement was important to prevent P.J.L. from making harmful

choices such as consuming alcohol with his medications. Dortch also testified that the "added support" of protective placement was a factor in P.J.L.'s improved decision making, but that even with this added support, P.J.L. still needed prompting and reminders for hygiene and other "daily tasks." Dortch also testified that continued oversight was necessary to detect whether P.J.L. again attempts suicide, and to call in emergency medical assistance if that occurs. Schultz acknowledged that P.J.L. had shown improvement in his medication and hygiene management, but that he still needed "continued follow-through on his daily chores" and continued to need improvement in avoiding alcohol consumption and controlling risky impulses.

¶24    P.J.L. now emphasizes testimony establishing that under his current protective placement he is allowed to exercise a certain amount of independence for much of his day. In particular, he is allowed to leave his group home and walk to local stores, and to generally spend his money and time as he pleases, without direct oversight until he returns to the home in the evening. These facts could have permitted the jury to draw inferences favorable to him. At the same time, however, this level of permitted independence during the day presumably made it possible for P.J.L. to continue to acquire and consume alcohol, placing him at risk of death. And, as explained above, evidence regarding that consumption is by itself a significant basis to sustain the jury's verdicts.

¶25    As with his arguments regarding incompetence, P.J.L. emphasizes only the evidence regarding areas of his day-to-day self-care in which he has shown improvement and independence. For example, there was testimony that he schedules, arranges, and attends his medical appointments, which are positive points in his favor. But the jury was not required to weigh testimony on these topics more heavily than the testimony summarized above supporting the finding

that P.J.L. continues to need the "added support" and oversight of a protective placement.

### III. Substantial Risk of Serious Harm

¶26    The final required protective placement standard that P.J.L. challenges in his sufficiency argument is whether there was sufficient evidence that P.J.L. was "so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others." *See* WIS. STAT. § 55.08(1)(c). "Serious harm may be evidenced by overt acts or acts of omission." Sec. 55.08(1)(c). Pertinent here, the County had the burden of proving that the risk of substantial harm was the result of P.J.L.'s "serious and persistent mental illness" (antisocial personality disorder) or his "other like incapacities" (the brain injury and alcoholism). *See* § 55.08(1)(c).

¶27    The term "care" as used in WIS. STAT. § 55.08(1)(c), "means that the person's incapacity to provide for his or her daily needs creates a substantial risk of serious harm to the person or others." *Susan H.*, 326 Wis. 2d 246, ¶17. "Custody" in § 55.08(1)(c) means "protection from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide." *Id.*

¶28    This court has explained the following regarding this required placement standard:

> The risk of harm must be substantial. Mere speculation as to difficulties [that an individual] may encounter is not sufficient. Specific harm must be foreseeable to fulfill this [standard]. Furthermore, the foreseeable harm must be serious .... [M]inor accidents, injuries and illness are not sufficient to satisfy this [standard].

***Zander v. County of Eau Claire***, 87 Wis. 2d 503, 514-15, 275 N.W.2d 143 (Ct. App. 1979).

¶29    As summarized above, the jury was presented with testimony regarding the effects that P.J.L.'s incapacities had on his ability to receive and evaluate information, and how this in turn related to his issues with the dangerous consumption of alcohol in combination with his medications. This included testimony that: the consumption of alcohol while being on these medications "could be lethal"; P.J.L. had made several suicide attempts; and P.J.L. at one time responded to the risk of consuming alcohol while on his medications by saying, "we'll … see." These portions of the trial evidence gave the jury a clear and convincing basis to find that P.J.L. was incapable of providing for his own care and custody, *i.e.*, making safe choices regarding the use of his medications, in a way that created a substantial, potentially lethal, risk to his wellbeing.

¶30    P.J.L. argues that the County was required, but failed, to prove that his alcohol use was caused by his antisocial personality disorder or by his brain injury. One problem with this argument is that there was a significant amount of evidence from which the jury could find that P.J.L.'s alcohol consumption was itself an "other like incapacity" that created a substantial risk under WIS. STAT. § 55.08(1)(c). *See* WIS. STAT. § 55.01(5). Further, I reject P.J.L.'s argument for the additional reason that, as explained above, there was evidence at trial connecting P.J.L.'s antisocial personality disorder and brain injury to the risks posed by his alcohol consumption. That is, there was evidence regarding the impairment of P.J.L.'s receipt and evaluation of information, and his decision-making related to alcohol consumption.

¶31    P.J.L. notes that some of the factors relied upon by the witnesses called by the County consisted of actions taken by P.J.L. at unspecified times or from incidents occurring as far back as 2009. For example, P.J.L. notes that Dr. Starr's report stated that P.J.L. had had multiple "psychiatric hospitalizations" and stays in jails or prisons, but without providing specifics such as the timing of those events. In another example, P.J.L. asserts that one of his "significant suicide attempts" noted in the report occurred in 2009. To the extent that P.J.L. means to argue that such incidents could not significantly support the jury's verdicts, the argument fails for two reasons. First, even if only recent, riskier behaviors could matter, the jury could reasonably view his issues with alcohol consumption as having been as recent as a few months before trial. Second, P.J.L. does not present a legally supported argument establishing that the jury could not view evidence regarding his suicide attempts or other less recent incidents as providing some support for the County's case that protective placement continued to be appropriate. So far as P.J.L. shows on appeal, his challenges to reliance on such evidence amount to concerns about their weight, which was for the jury to assess.

¶32    P.J.L. appears to again rely on the permission he was granted to go into town unsupervised as a basis to challenge whether the WIS. STAT. § 55.08(1)(c) was met. That is, P.J.L. suggests that it undermined the County's position that he was dangerous to himself that he was allowed to leave his placement facility daily without supervision. I reject these arguments for the reasons noted above. The jury was free to infer that P.J.L.'s use of this level of independence in ways that could harm him necessitated the level of oversight that his placement provided.

### IV. Circuit Court's Post-Verdict Actions

¶33  P.J.L. briefly asserts that the circuit court did not satisfy WIS. STAT. § 55.18(3)(e)1. in ordering the continuation of P.J.L.'s protective placement following the jury's verdicts in the County's favor.  But P.J.L. does not address the specific terms of § 55.18(3)(e) or cite any related case law.  Rather, he only passingly refers to the court's post-verdict actions, and he otherwise fails to develop an argument that reversal is necessary on this ground.

¶34  WISCONSIN STAT. § 55.18 governs the "[a]nnual review of protective placement," outlining the procedures for annual extensions of placements under WIS. STAT. ch. 55.  Under § 55.18(3)(e), following a hearing (which at the person's demand may be tried to a jury, as here) on whether continued placement is appropriate, the circuit court "shall" take one of several specified actions.  *See also* § 55.18(3)(d); WIS. STAT. § 55.10(4)(c).  Pertinent here, if the court "finds that the individual continues to meet the standards under [WIS. STAT. §] 55.08(1) and the protective placement of the individual is in the least restrictive environment …, the court shall order the continuation of the protective placement in the facility in which the individual resides at the time of the hearing."  Sec. 55.18(3)(e)1.  Further, subpart (3)(e)1. requires the court to "include in the order the information relied upon as a basis for the order and shall make findings based on the standards under [§] 55.08(1) in support of the need for continuation of the protective placement."

¶35  Here, after the jury rendered its verdicts, the County moved the circuit court "to accept the jury's verdicts" and to issue an order continuing the protective placement.  The court responded that "there was evidence introduced, namely by Dr. Starr especially here, that the jury would be able to answer any

16

question yes as to [whether] the [in]competency is permanent or likely to be permanent and that he was in need of then protective placement as well." The court further stated that it was "adopt[ing]" the jury's findings that P.J.L.

> continues to meet the standard for protective placement because [he] has a primary need for residential care and custody as a result of the serious and persistent mental illness and the other like incapacities that [he] is so totally incapable of providing for [his] own care and custody as to create a substantial risk of serious harms to himself or others; that serious harm was evidenced here by overt acts then related to that; that [he] has a disability that's permanent or likely to be permanent; that the current placement in a protective placement is the least restrictive environment consistent with [his] needs ….

The written order issued by the court is not detailed. But it indicates that the court held "a full due process hearing," and contains checked boxes reflecting findings consistent with the court's comments following trial.

¶36    Assuming without deciding that WIS. STAT. § 55.18(3)(e)1. applies when a placement continuation petition is tried to a jury, I reject as undeveloped P.J.L.'s assertion that the circuit court did not do enough to satisfy § 55.18(3)(e)1. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Given the unambiguous findings of the jury and the evidence provided at trial as discussed above, P.J.L. fails to provide a legally supported argument explaining why I should conclude that reversal is appropriate because the court's post-verdict actions did not satisfy the terms of § 55.18(3)(e)1.

## CONCLUSION

¶37    For all these reasons, I affirm the order of the circuit court.

*By the Court.*—Order affirmed.

17

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.