**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 14, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP2117**

Cir. Ct. No. **2025ME113**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

IN THE MATTER OF THE MENTAL COMMITMENT OF E.R.B.:

WINNEBAGO COUNTY,

    PETITIONER-RESPONDENT,

  V.

E.R.B.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Dane County: MICHAEL GIBBS, Judge. *Orders affirmed.*

¶1 NASHOLD, J.[1] E.R.B. appeals orders extending his commitment under WIS. STAT. ch. 51 and authorizing his involuntary medication and treatment.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

He argues that there was insufficient evidence to support either the commitment or the medication order. I conclude that there was sufficient evidence to sustain the commitment order, and that the medication order, having expired, is moot.

## BACKGROUND

¶2 During the pertinent time period, E.R.B. was incarcerated at the Wisconsin Resource Center. The circuit court ordered his initial commitment in January 2024, concluding that he was dangerous to himself and to others under the first and second dangerousness standards, respectively, and also that he met the fifth standard of dangerousness (incompetency to refuse medication and a substantial probability of severe harm). *See* WIS. STAT. § 51.20(1)(a)2.a., b., e. He was also placed under an order for involuntary medication and treatment.

¶3 In June 2024, Winnebago County filed a petition to extend E.R.B.'s commitment, which included a request for involuntary medication. The petition was tried to a jury. This time the County sought to prove E.R.B. dangerous under two standards: the second and the fifth. *See* WIS. STAT. § 51.20(1)(a)2.b., e. As to both standards, the County specifically alleged, under § 51.20(1)(am), that E.R.B. would become a proper subject for commitment if treatment were withdrawn. Because I affirm as to the second standard, I do not decide whether the evidence was sufficient under the fifth standard, and this opinion will summarize only the evidence relevant to E.R.B.'s danger to others.

¶4 At the trial, a worker at the institution where E.R.B. was confined testified that in December 2023, he was working near E.R.B.'s cell when E.R.B., inside the locked cell, began to bang on the door and call the worker, others at the institution, and the then-serving President of the United States "pedophiles." The worker testified that E.R.B. said that he wanted to kill the worker and that E.R.B.

was in a "boxing stance" while pounding on the door. The same worker testified that the following day, E.R.B. once again yelled at the worker through the closed cell door, calling him a "bitch" and saying "I'll fucking kill you."

¶5     The worker testified that one of his responsibilities is to remove residents from their cells and escort them to other parts of the institution, and that he was concerned that E.R.B. could attack or hurt him while he was performing this duty, even though the threats were uttered when E.R.B. was behind a locked door. The worker also testified that E.R.B. apologized a few days after these incidents but that the worker still did not feel safe.

¶6     A supervisor at the institution testified that in October 2023, he and another supervisor had discussed with E.R.B. the possibility of E.R.B. moving to a different unit within the institution. The reason for the contemplated move was that E.R.B. "was very possessive of some of the older gentlemen" in the unit where he then resided, and was "having some of the lower-functioning individuals on the unit only refer to him as 'the chosen one.'" The supervisor testified that E.R.B. said that if he were moved, he would assault another resident and would assault institution staff who responded to his assault on the resident.

¶7     The County also called a psychiatrist who had met with E.R.B. several times, reviewed his treatment record, and prepared a report on his condition. Asked if E.R.B. has a mental illness, the psychiatrist replied, "I think he suffers from schizophrenia." The psychiatrist outlined symptoms of schizophrenia, including delusions, fluctuating mood, "a high degree of irritability," and poor impulse control. The psychiatrist opined that E.R.B.'s schizophrenia grossly impaired his judgment, behavior, and capacity to recognize reality, and that it interfered with his ability to meet the ordinary demands of life.

¶8 Asked specifically about symptoms or delusions he had observed in E.R.B., the psychiatrist described E.R.B.'s "inability to see that the [psychotropic] medications are effective, have been effective, and that … there's a … potential for the benefit." The psychiatrist also testified that E.R.B. has "delusions … or preoccupation with this notion of having a liver lesion as well as kidney stones." The psychiatrist explained that while E.R.B. does have kidney stones, as well as a "small cyst in the liver," both had been medically evaluated and no surgery was warranted. The psychiatrist also testified that since E.R.B. had been medicated, he is still preoccupied with his liver, "but now that he's on [medication], he tends to listen to the recommendations" of his physicians as to how to manage the condition, rather than demanding to be taken to the emergency room. The psychiatrist also cited an incident from 2022: E.R.B. had been released from a prior confinement, and after two months was again arrested; he then attempted suicide while in jail.

¶9 The psychiatrist also testified that if E.R.B. were not medicated, "he's sure to decompensate." He stated that E.R.B. has a "history of decompensation of his mental status every time he's off medications." He said that E.R.B. had "clearly expressed his intention to stop the medication without giving me any good reasons to do so."

¶10 The psychiatrist testified that he attempted to educate E.R.B. about his mental illness and the treatments "[a]t every opportunity," discussing "risks, benefits, alternatives, advantages and disadvantages." He added that at his most recent meeting with E.R.B., E.R.B. "was noncommittal regarding the diagnosis and more focused on not taking the medication" once the then-current medication order expired. The psychiatrist testified that when he tried to convince E.R.B. that this was not a good idea, E.R.B. "said, 'well, I want a jury trial,' and that was it."

¶11 When asked if there were any incidents that made him concerned for his safety, the psychiatrist described an incident in the fall of 2023. During a meeting with E.R.B., the psychiatrist told E.R.B. that he would not prescribe a medication that E.R.B. requested, after which E.R.B. "promptly got up and puffed his chest out and … made a step towards me." The psychiatrist testified that he had only observed E.R.B. for "seven minutes prior to" this action, so he decided to end the interview and ask E.R.B. to leave the room.

¶12 The jury found E.R.B. mentally ill, treatable, and dangerous under both the second and fifth standards (as modified by the WIS. STAT. § 51.20(1)(am) proviso that he would be a proper subject for commitment if treatment were withdrawn). The circuit court accordingly ordered E.R.B.'s commitment extended. The court also found that the psychiatrist had explained to E.R.B. the advantages, disadvantages, and alternatives to accepting medical treatment, and that E.R.B. was incapable of applying an understanding of these matters to his mental illness. The court accordingly entered an order for involuntary medication. E.R.B. appeals.

## DISCUSSION

### I. General principles and standards of review.

¶13 As with an initial commitment order, to secure an order recommitting a person under WIS. STAT. ch. 51, a petitioner must demonstrate that the person meets three criteria. First, the person must be mentally ill. WIS. STAT. § 51.20(1)(a)1. Second, the person's condition must be treatable. § 51.20(1)(a)1. Third, the person must be dangerous. § 51.20(1)(a)2.; *Langlade County v. D.J.W.*, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277.

¶14 E.R.B. contends that the County failed to adduce sufficient evidence to prove the first criterion (mental illness) and the third criterion (dangerousness). Because these issues were tried to a jury, this court must affirm the verdict "'if there is any credible evidence, when viewed in a light most favorable to the verdict, to support it.'" *Outagamie County v. Michael H.*, 2014 WI 127, ¶21, 359 Wis. 2d 272, 856 N.W.2d 603 (quoted source omitted). This court must uphold a jury verdict even though the evidence supporting it "'[is] contradicted and the contradictory evidence [is] stronger and more convincing.'" *Id.* (quoted source omitted).

¶15 E.R.B. also argues that there was insufficient evidence to support the order for involuntary medication and treatment. The decision whether to enter such an order is committed to the circuit court, rather than a jury. WIS. STAT. § 51.61(1)(g)3. The standard of review for this decision is mixed; an appellate court will not disturb the circuit court's factual findings unless they are clearly erroneous, but independently determines whether the facts as found satisfy the statutory standard. *Outagamie County v. Melanie L.*, 2013 WI 67, ¶¶38-39, 349 Wis. 2d 148, 833 N.W.2d 607.

*II. There was sufficient evidence that E.R.B. is mentally ill.*

¶16 E.R.B. first contends that the County did not adduce evidence sufficient to sustain the jury's verdict that he is mentally ill. The statutes provide a definition of "mental illness" specific to involuntary commitments under WIS. STAT. ch. 51: "a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life, [excluding] alcoholism." WIS. STAT. § 51.01(13)(b).

6

¶17     E.R.B.'s argument on this element focuses on the testimony of the psychiatrist. As noted, when asked whether E.R.B. has a mental illness, the psychiatrist responded, "I think he suffers from schizophrenia," an answer E.R.B. describes as "conclusory." Further, E.R.B. points out that when asked what symptoms the psychiatrist had observed in E.R.B. to support this diagnosis, the psychiatrist did not give an answer specific to E.R.B., but instead gave a list of symptoms that are associated with schizophrenia generally. The psychiatrist also testified that E.R.B., when unmedicated, has a "preoccupation" with his benign liver cyst and his kidney stones, demanding to be taken to the emergency room, but that when medicated, E.R.B. is willing to accept the advice of his medical doctors. The psychiatrist also regarded E.R.B.'s failure to see the benefit of his psychotropic medications, along with his 2022 suicide attempt, as signs of schizophrenia. Further, the psychiatrist noted E.R.B.'s holding himself out as a "guru" to other residents, and stated that "religious preoccupation is one of the cardinal signs of schizophrenia. So religious beliefs versus, you know, the religiously-themed psychosis," the latter of which the psychiatrist attributed to E.R.B.

¶18     E.R.B. describes all of the above as "thin" evidence that he is mentally ill. I agree in two senses: first, the psychiatrist provided little detail to support his conclusion that E.R.B. has schizophrenia, and second, the facts that the psychiatrist did provide are open to many possible interpretations. Nevertheless, applying the standard of review—on which the parties agree—I must sustain the jury's verdict on the question of E.R.B.'s mental illness. That verdict must stand if there is "any credible evidence" supporting it. *Michael H.*, 359 Wis. 2d 272, ¶21. Further, "if the evidence gives rise to more than one reasonable inference,

7

[courts] accept the particular inference reached by the jury." *Id.* (emphasis omitted).

¶19 I conclude that the psychiatrist's testimony constitutes credible evidence from which a factfinder could reasonably infer that E.R.B. has schizophrenia. E.R.B. is correct that "conclusory opinions parroting the statutory language" would be insufficient to meet the County's burden. *Winnebago County v. S.H.*, 2020 WI App 46, ¶17, 393 Wis. 2d 511, 947 N.W.2d 761. But the psychiatrist's testimony here, while admittedly not overwhelming in its force, did supply both facts about E.R.B. and a rationale connecting those facts to his diagnosis of schizophrenia. I must therefore uphold the jury's decision on this issue.

### III. There was sufficient evidence that E.R.B. is dangerous under the second standard.

¶20 The statutory definition of the second standard, dangerousness to others, requires a petitioner to show that the subject "[e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them." WIS. STAT. § 51.20(1)(a)2.b. Because the proceedings here were for the extension of a commitment, the usual requirement of "recent" acts may be replaced "by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." § 51.20(1)(am).

¶21 The trial evidence here included testimony and exhibits about E.R.B.'s threats to kill an institution worker, to assault another resident, and to

assault institution staff who responded to the threatened assault of the resident. E.R.B. argues that the threat to kill the worker was not sufficiently plausible to instill reasonable fear because E.R.B. was behind a locked door when he made the threat, and that the threat to assault various people if he were moved to a different unit was conditioned on that move actually occurring. I conclude that the evidence was sufficient for the jury to conclude that E.R.B. demonstrated a "substantial probability of physical harm to other individuals." WIS. STAT. § 51.20(1)(a)2.b. The worker E.R.B. threatened to kill testified that, although E.R.B. was behind a locked door when he made the threat, the worker's duties included escorting E.R.B. within the institution, and that he feared that E.R.B. might attack him during this time. As to the other threats, while it may have been possible that E.R.B. would not be moved, this possibility did not foreclose the conclusion that his threats to assault residents and staff instilled "reasonable fear of violent behavior and serious physical harm." § 51.20(1)(a)2.b.

¶22 E.R.B. argues that these threats were not "recent" threats under WIS. STAT. § 51.20(1)(a)2.b. He further argues that the § 51.20(1)(am) standard—which allows for a dangerousness finding where the person would be a proper subject for commitment if treatment were withdrawn—is not met here.

¶23 Regarding E.R.B.'s first argument, as noted, the County need not show "recent" threats. *See* WIS. STAT. § 51.20(1)(am). As to E.R.B.'s second point, I conclude that sufficient evidence supports the jury's finding that E.R.B. would be a proper subject for commitment if treatment were withdrawn. The threats to kill and threats to assault all came toward the end of 2023, just before E.R.B. was initially committed. Related to those initial commitment proceedings, E.R.B. became subject to involuntary medication. It is true, as E.R.B. argues, that the County presented no evidence of similar behavior in the six months preceding

the extension hearing on appeal. But it is also true that the recommitment standard contemplates that a lack of recent dangerous behavior may be attributable to treatment, and thus provides that dangerousness can be shown by evidence that the withdrawal of treatment would result in further dangerous behavior. **S.H.**, 393 Wis. 2d 511, ¶9.

¶24 E.R.B. argues that his is a case in which his threats were "old enough, weak enough, or otherwise insufficient to support clear and convincing evidence under the substantial likelihood of the dangerousness test." **Id.**, ¶13 n.6. I disagree. Less than a year passed between the threats and the recommitment hearing. There was testimony that E.R.B. had stated that he would not take psychotropic medication if he were not committed. And there was expert testimony that the medication improved E.R.B.'s condition, and that if he did not take the medication, he would decompensate, in ways that had led to previous dangerous behavior. The logical connections between the threats, the effect of the medication, E.R.P.'s stated intention to discontinue the medication, and his history when unmedicated are all robust. This is not to say that the passage of time did not weaken the inference of dangerousness, or that the passage of more time would not weaken that inference further. But I conclude that the jury's verdict that E.R.P. would become a proper subject for commitment if treatment were withdrawn was supported by some credible evidence, and thus that I must sustain the jury's verdict.[2]

---

[2] As noted, because I conclude that the jury's verdict must be upheld as to the second standard, I do not address whether there was sufficient evidence supporting the jury's verdict on the fifth standard. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (appellate court need not address every issue raised by the parties when one is dispositive).

*IV. The medication order is moot.*

¶25    Both the commitment order and the medication order on appeal have expired.[3]  It is undisputed that the appeal of the commitment order is not moot, for the reasons given in ***Sauk County v. S.A.M.***, 2022 WI 46, ¶¶23-27, 402 Wis. 2d 379, 975 N.W.2d 162.  However, the appeal of the medication order is moot, as "'its resolution will have no practical effect on the underlying controversy.'" ***Portage County v. J.W.K.***, 2019 WI 54, ¶11, 386 Wis. 2d 672, 927 N.W.2d 509 (quoted source omitted).  E.R.B. argues that the medication order is not moot, *see* ***Outagamie County v. L.X.D.-O.***, 2023 WI App 17, ¶14, 407 Wis. 2d 441, 991 N.W.2d 518, but all of his arguments on this point assume that the underlying commitment order is invalid.  Having concluded that the underlying commitment order is valid, I also conclude that there is no live controversy regarding the medication order.  E.R.B. does not argue that exceptions to the mootness doctrine apply, so I do not address the medication order further.

    *By the Court.*—Orders affirmed.

    This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[3] This court endeavors to decide appeals of WIS. STAT. ch. 51 commitments before the commitments expire whenever possible.  In this case, E.R.B.'s appellant's brief notes that the public defender was unable to appoint counsel for E.R.B. until nearly nine months of the one-year commitment extension period had passed.  Accordingly, briefing was not completed until after the recommitment order had expired.